### In re CONSUMERS POWER COMPANY SECURITIES LITIGATION.

Civ. A. No. 83CV–6448–AA.

United States District Court, E.D. Michigan, S.D.

April 17, 1985.

584

Roger E. Craig, Craig, Farber, Downs & Dise, Detroit, Mich., Arthur N. Abbey, Abbey & Ellis, New York City, Stanley R. Wolfe, Karen Orman, Berger & Montague, P.C., Philadelphia, Pa., Gene Mesh, Richard S. Wayne, Cincinnati, Ohio, Daniel W. Krasner, Fred Taylor Isquith, Wolfe, Haldenstein, Adler, Freeman & Hertz, New York City, Harvey S. Kronfeld, Stuart W. Miller, Rawle & Henderson, Philadelphia, Pa., for plaintiffs.

James K. Robinson, Honigman, Miller, Schwartz & Cohn, Detroit, Mich., James J. Hagan, New York City, for defendants.

## MEMORANDUM OPINION AND ORDER

JOINER, District Judge.

## I. BACKGROUND

This case is brought under the federal securities laws by a group of investors who purchased common stock in Consumers Power Company, a public utility with its principal place of business in Jackson, Michigan. The defendants are the Consumers Power Company ("Consumers"), the sixteen members of Consumers' Board of Directors during the relevant time period (the "individual defendants"), and Morgan Stanley & Co. ("Morgan"), a New York investment banking firm.

Consumers' problems with its ill-fated Midland nuclear power plant form the backdrop for this litigation. The utility began constructing the Midland plant in 1968. The plant was designed to generate electricity for local customers and furnish process steam to the Dow Chemical Company ("Dow") pursuant to 1967 and 1978 agreements between Consumers and Dow.

The amended consolidated complaint in this case, filed July 6, 1984 (the "complaint") alleges that the Midland plant was beset with design, construction, and regulatory difficulties almost from the start. One of the most serious problems described in the complaint is the alleged inability of the fill soil at the site to support the facility. Plaintiffs contend that Consumers knew of this problem as early as 1977, but initially failed to disclose it to the investing public, to Dow, or to the Nuclear Regulatory Commission ("NRC"). Instead, Consumers allegedly falsified soil test results to the NRC and remained silent. The utility revealed the existence of a soil problem only when a building subject to NRC reporting requirements began to sink.

The complaint alleges that the soil problem and defects in the nuclear plant's design and construction were disrupting the timing and cost of the project significantly by the beginning of 1980. In the wake of the accident at Three Mile Island, the NRC imposed new construction and safety requirements. In addition, the NRC rejected Consumers' plan to fix the sinking and soil problems and ordered a stop to the remedial soil work. These developments required substantial reworking and reinspection of the Midland plant, causing delays and enormous cost increases.

Consumers obtained money to satisfy the ever-increasing cost of the Midland plant through a series of four public offerings of common stock that were made between March, 1982, and November, 1983. Defendant Morgan served as head underwriter for three of the four issues. Plaintiffs all bought shares of Consumers stock pursuant to one or more of these offerings.

In late 1982, the NRC fined Consumers $120,000 for deficiencies in the installation, inspection and supervision of the Midland plant construction. By December 1982, construction was suspended on the safety-

related portions of the plant structure, and the NRC had informed Consumers that it would require a complete reinspection of the plant. On July 14, 1983, Dow terminated its contract to purchase steam from the Midland plant. Dow also initiated a $60 million lawsuit against Consumers, alleging that Dow should be discharged from the contract because of Consumers' alleged misrepresentations and nondisclosures. This lawsuit is currently pending in state court.

On November 9, 1983, Consumers announced that the first unit of the Midland plant would not become operational until at least mid-1986, more than one year later than had last been publicly announced. In addition, Consumers announced a "substantial" increase in the completion cost, which most recently had been estimated at $4.43 billion. On November 15, 1983, Consumers indicated that the completion cost would be over $4.5 billion. The November announcements allegedly caused a 25% plunge in the price of Consumers stock. Further price reductions followed as additional details of the Midland plant problems became known.

In February, 1984, Consumers announced plans to delay paying its principal contractor, Bechtel Power Corporation ("Bechtel"), and reduce wages for 800 employees working on the plant. In April, 1984, Consumers stated that it was cutting dividends and considering abandoning the plant and filing for bankruptcy. On July 16, 1984, the directors of Consumers authorized shutting down construction of the Midland plant.

Plaintiffs allege that Consumers, its directors, and Morgan inflated the value of Consumers stock in 1982 and 1983 by concealing the problems with the Midland plant. They contend that the offering materials for each of the four common stock issues contained a variety of material misrepresentations and omissions. These alleged deceptions include a failure to reveal the risk that the plant could not be completed on schedule; the amount of the cost overruns; and the possibility that Dow would abrogate its contract, make substantial claims against Consumers, and render Consumers' investment in building a facility for Dow unrecoverable. Plaintiffs also claim that the offering materials falsely blame more stringent NRC requirements for delays and cost overruns that were really due to soil and fill problems; to Consumers' cumbersome, haphazard and ineffective plan to solve the soil problems; and to Consumers' failures to control the design and construction of the plant.

The complaint asserts seven counts. The first four counts are brought under § 11 of the 1933 Act, 15 U.S.C. § 77k (1981). Count I is brought by Dr. Abraham Lubowitz on behalf of himself and all others who purchased Consumers stock pursuant to the "Dividend Reinvestment Plan," which was first offered to the public on March 17, 1982. It states a claim against Consumers and the individual defendants. Count II is a § 11 claim by Myron and Gertrude Grodin, brought on behalf of themselves and all others who bought Consumers stock pursuant to the February 17, 1983 public offering. It names as defendants Consumers, the individual defendants, and Morgan, individually and as a representative of the group of underwriters that sold the February 17, 1983 offering. Count III is a § 11 claim by plaintiffs Jack Bronston, Richard Weiland, Rhoda Fineman, and Dr. Shirley Sherrod. It asserts claims against Consumers, the individual defendants, and Morgan, on behalf of plaintiffs and all others who purchased Consumers stock pursuant to the June 21, 1983 offering. Once again, Morgan is sued individually and as a representative of the June underwriters selling group. Count IV is brought by J. Norman Lewis and Anne Mary Weil on behalf of themselves and all others who bought Consumers stock pursuant to the October 13, 1983 offering. It asserts § 11 claims against Consumers, the individual defendants, and Morgan, individually and as a representative of the October underwriters group.

Count V of the complaint alleges securities fraud under § 10(b) of the 1934 Act, 15 U.S.C. § 78j(b) (1981), and Rule 10b–5, 17

C.F.R. § 240.10b–5 (1984). It is brought against Consumers and the individual defendants by plaintiffs Lubowitz, Weiland, and Fineman on behalf of the themselves and all others who purchased Consumers stock on the open market between March 17, 1982 and November 9, 1983.

Counts VI and VII of the complaint assert state law claims against Consumers and the individual defendants. Count VI alleges common law fraud and deceit. Count VII asserts a claim of negligent misrepresentation.

Two motions are presently before this court. The first is defendants' motion to dismiss this case, and the second is plaintiffs' motion for certification of five plaintiff classes and three defendant classes.

## II. MOTION TO DISMISS

### A. *Fraud Claims and Fed.R.Civ.P. 9(b)*

The complaint states two fraud claims: Count V under § 10(b) and Rule 10b–5, and Count VI for common law fraud and deceit. Defendants contend that these counts fail to plead fraud with particularity, and that Fed.R.Civ.P. 9(b) therefore requires their dismissal. Plaintiffs argue that the allegations of fraud made in Counts V and VI are more than particular enough to satisfy Rule 9(b).

 Rule 9(b) provides that "[i]n all averments of fraud ... the circumstances constituting fraud ... shall be stated with particularity." This means that conclusory allegations that defendants' conduct was fraudulent are insufficient. Instead, the complaint must describe the conduct that constitutes the fraud with some specificity. *See, e.g., Decker v. Massey-Ferguson, Ltd.,* 681 F.2d 111, 114 (2d Cir.1982). The particularity requirement of Rule 9(b) serves three purposes. First, it ensures that fraud allegations are concrete enough to give defendants fair notice of the grounds of the complaint, so that they can prepare a defense. Second, it protects defendants' reputations or goodwill from the harm that comes from being accused of serious wrongdoing. Third, it inhibits the filing of complaints that are a pretext for the discovery of unknown wrongs, or that are groundless claims designed to coerce a settlement out of defendants who wish to avoid the time and expense of defending themselves. *See, e.g., Ross v. A.H. Robins Co.,* 607 F.2d 545, 557 (2d Cir.1979), *cert. denied,* 446 U.S. 946, 100 S.Ct. 2175, 64 L.Ed.2d 802 (1980); *Benoay v. Decker,* 517 F.Supp. 490, 492 (E.D.Mich.1981), *aff'd mem.,* 735 F.2d 1363 (6th Cir.1984).

 The particularity requirement of Rule 9(b), however, must be read in conjunction with Fed.R.Civ.P. 8(a)(2), which requires a complaint to consist of a short and plain statement of the claim. *See, e.g., Schlick v. Penn-Dixie Cement Corp.,* 507 F.2d 374, 379 (2d Cir.1974), *cert. denied,* 421 U.S. 976, 95 S.Ct. 1976, 44 L.Ed.2d 467 (1976); *Jordan v. Global Natural Resources, Inc.,* 564 F.Supp. 59, 68 (S.D.Ohio 1983); *Denny v. Barber,* 73 F.R.D. 6, 8–9 (S.D.N.Y.1977), *aff'd,* 579 F.2d 465 (2d Cir. 1978). In addition, Rule 9(b) does not require plaintiffs to plead detailed evidentiary matters. *Ross v. A.H. Robins Co.,* supra, at 557 n. 20; *Schlick v. Penn-Dixie, supra.*

Defendants argue that the complaint in this case fails to satisfy Rule 9(b) because it is based on information and belief. The opening words of the complaint confirm this by stating the "Plaintiffs ... allege for their [complaint], upon information and belief, except with respect to paragraphs 5–12, which are based upon personal knowledge of the individual plaintiffs to whom the allegations refer."

 As a general rule, allegations based on information and belief fail to satisfy the particularity requirement of Rule 9(b). *See, e.g., D & G Enter. v. Continental Illinois Nat'l Bank,* 574 F.Supp. 263, 267 (N.D.Ill.1983). However, an exception to this rule exists for matters that are peculiarly within the knowledge of the opposing party. As the Second Circuit has stated:

> [T]he rule relating to information and belief may be relaxed as to matters peculiarly within the opposing party's knowl-

edge, as where the complaining stockholders in a derivative suit have little information about the manner in which the corporation's internal affairs are conducted and hence are rarely able to provide details as to the alleged fraud. *Schlick v. Penn-Dixie, supra* (citing 5 C. Wright & A. Miller, Federal Practice and Procedure: Civil § 1298, at 416 (1969)). Thus, plaintiffs may plead matters within the knowledge of the opposing party on information and belief, as long as they they include a statement of the facts upon which the belief is based. *Schlick, supra; D & G Enter., supra.*

Defendants argue that the complaint does not fall within the exception allowing pleading on information and belief. They contend that plaintiffs omit any claim that the alleged wrongs are peculiarly within the knowledge of defendants, and that plaintiffs fail to describe the facts on which their beliefs are based. Plaintiffs respond that the complaint makes it obvious that the alleged wrongdoing is peculiarly within the knowledge of the defendants, as the plaintiffs are merely outside stockholders of Consumers with no apparent means of obtaining information about inside corporate activities. Plaintiffs state that the sources of their beliefs are also revealed, as their claims center on the statements and omissions made in Consumers' offering materials.

In considering the adequacy of plaintiffs' claims on information and belief, it is helpful to keep Fed.R.Civ.P. 11 in mind. Rule 11, as amended in 1983, stresses the need for prefiling inquiry into the facts and law asserted in papers filed with the court. It also emphasizes the propriety and necessity of imposing reasonable sanctions for pleading abuse on attorneys, on clients, or on both. *See* Fed.R.Civ.P. 11 advisory committee note. While Rule 11 does not control the analysis of this complaint under Rule 9(b), it indicates a modern trend toward requiring lawyers to draft their papers with more specificity, even at the very beginning of a case.

With these considerations in mind, the court concludes that defendants are entitled to a more definite and specific statement of the factual bases for the allegations made against them. Plaintiffs do identify the particular documents that they challenge, and state why they believe these documents are false or misleading. However, plaintiffs fail to reveal their factual sources for the alleged chronology of problems at the Midland plant, and for the alleged conspiracy to conceal these problems and inflate the value of Consumers stock. The court therefore will dismiss Counts V and VI of the complaint for failure to comply with Rule 9(b), unless plaintiffs submit an amended complaint that states the factual bases for plaintiffs' information and beliefs within thirty (30) days of the date of this memorandum opinion and order.

Defendants also argue that the complaint runs afoul of Rule 9(b) because it fails to differentiate among the individual defendants, and state with particularity the role that each defendant played in the fraud. They cite numerous cases in which courts have dismissed cases under Rule 9(b) because the role of each defendant was not specified. Almost all of these cases are distinguishable from the present case, however. The cases cited by defendants generally involve allegations of fraud made against a group of defendants who occupied diverse roles in the alleged wrongdoing. Yet plaintiffs in these cases merely named the defendants individually at the beginning of the complaint, and thereafter referred only to "the defendants" as a group in describing the various specific acts of wrongdoing. The complaints thus gave the individual defendants no clear idea of the role in the alleged wrongful scheme defendants were charged with occupying. The courts in these cases concluded that the complaints violated Rule 9(b) by failing to give defendants proper notice of the charges against them, so as to enable them to prepare a defense. *See, e.g., Hokama v. E.F. Hutton & Co.*, 566 F.Supp. 636, 645–46 (C.D.Cal.1983) (plaintiffs suing a group of individuals and cor-

porations should have specified the roles of each defendant in preparing and disseminating the fraudulent statements and making the unlawful sales); *Natowitz v. Mehlman*, 542 F.Supp. 674, 676 (S.D.N.Y.1982) (complaint's vague references to acts committed by the "defendants" failed to provide adequate notice to the defendant partnership, partners, and corporations); *Benoay v. Decker, supra,* at 492–94 (complaint alleged only that a varied group of defendants were "co-conspirators" in the fraud, and made no attempt to link them to a specific act or distinguish among them); *O'Connor & Assoc. v. Dean Witter Reynolds,* 529 F.Supp. 1179, 1196–97 (S.D.N.Y. 1981) (defendants could not tell if they were being sued as primary or secondary defendants, or whether they were being charged with tipping or trading or both).

Plaintiffs argue that individualized discussions of the role of each member of the Consumers Board of Directors is unnecessary. They cite a number of cases that find Rule 9(b) to be satisfied when plaintiff identifies a defendant as a member of a group, and sues on the basis of fraud in documents that are the collective product of the group. In such cases, specific allegations about the acts of each group member are not essential, as long as plaintiff specifies the fraud committed by the group. *See, e.g., Somerville v. Major Exploration, Inc.,* 576 F.Supp. 902, 911 (S.D.N.Y.1983) (Rule 9(b) satisfied when defendants were identified as officers and/or directors, and the alleged misrepresentations and omissions were in documents like annual reports and financial statements that entail the collective actions of the officers and/or directors); *Zatkin v. Primuth,* 551 F.Supp. 39, 42 (S.D.Cal.1982); *Pellman v. Cinerama, Inc.,* 503 F.Supp. 107, 111 (S.D.N.Y.1980); *In re Equity Funding*

*Corp. of America Sec. Litig.,* 416 F.Supp. 161, 181 (C.D.Cal.1976).[1]

It thus appears that a plaintiff suing a group of defendants who allegedly committed a variety of distinct fraudulent acts must specify which defendant is alleged to have done what act. However, when a plaintiff sues individual group members on the basis of the collective product of the group, specific allegations about the role of each defendant are unnecessary.

Plaintiffs have therefore alleged the role of each individual who signed the registration statement or SEC form in question with sufficient particularity. By signing the document, the defendant has identified himself or herself as a member of the group that made the statements that are challenged. The role of each member of the group promulgating the allegedly fraudulent documents is stated with sufficient particularity to satisfy Rule 9(b).

Not all of the individual defendants signed each of the documents that are challenged in this case, however. The complaint as it now stands reveals no way to determine whether or not these individuals played any role in disseminating the allegedly fraudulent materials that they did not sign. Fraud liability cannot be predicated merely on the status of an individual as a director of Consumers. Instead, the individual must have been involved in the alleged fraud as an aider and abettor, a conspirator, or as a substantial participant. *See Decker, supra,* at 119; *Lanza v. Drexel,* 479 F.2d 1277, 1289 (2d Cir.1973) (en banc). Plaintiffs must allege the role played by the non-signing directors with specificity. Conclusory allegations will not be sufficient. *Decker, supra.* Therefore,

---

1. One case supports defendants' argument that Rule 9(b) requires descriptions of the role of each defendant, even when the defendants are members of the group that promulgated the allegedly fraudulent documents. In *Goldman v. Belden,* 98 F.R.D. 733 (W.D.N.Y.1983), the plaintiff stockholder sued the company and its ten member Board of Directors. Plaintiff alleged securities fraud, claiming that the company's annual reports, press releases and quarterly statements were false and misleading. The court dismissed the fraud claims as to the ten director defendants, finding that the plaintiff had not detailed their individual roles in the fraud with sufficient particularity, but allowed plaintiff to file an amended complaint within thirty days. 98 F.R.D. at 739–40.

the court will dismiss Counts V and VI to the extent they charge an individual defendant with fraud contained in documents that he or she did not sign, unless plaintiffs submit an amended complaint specifically identifying the fraud committed by these defendants within thirty (30) days of the date of this memorandum opinion and order.

B. *Section 11 Claims and Fed.R.Civ.P. 9(b)*

█ Counts I through IV of the complaint allege violations of § 11 of the 1933 Act, 15 U.S.C. § 77k (1981). Section 11 provides that the purchaser of a security sold pursuant to a registration statement containing material misstatements or omissions may sue everyone who signed the statement, every director of or partner in the issuer, every underwriter involved with the security, and a number of others. To establish a § 11 claim, all plaintiff need show is that he purchased a security that was part of a registered offering and the registration statement contained a material misstatement or omission. Liability is virtually absolute, even for innocent misstatements. *See Herman & MacLean v. Huddleston*, 459 U.S. 375, 103 S.Ct. 683, 687, 74 L.Ed.2d 548 (1983).[2]

█ Both sides agree that the particularity requirement of Rule 9(b) does not apply to ordinary § 11 claims, as they do not include allegations of fraud. *See, e.g., Schoenfeld v. Giant Stores Corp.*, 62 F.R.D. 348, 350–51 (S.D.N.Y.1974) ("In view of the differing elements of proof required to sustain an action under Sections 10(b) and 11, it is clear that a pleading under Section 11 is not restricted by the rule of particularity which is demanded for actions sounding in fraud."). Defendants assert, however, that Rule 9(b) applies to plaintiffs' § 11 claims because they "sound in fraud." In other words, plaintiffs have chosen to allege fraud in making their § 11 claims although § 11 does not require them to do this. Defendants claim that Counts I

through IV "sound in fraud" because they incorporate by reference the prior allegations of the complaint, which include allegations of fraud.

Plaintiffs protest that their first four counts are based exclusively on § 11. They deny that general language that incorporates the preceding paragraphs of the complaint by reference converts § 11 claims into fraud claims. The court agrees with plaintiffs. It is true that the recitation of facts at the beginning of the complaint contains a mixture of allegations of negligence, fraud, and the misleading nature of the offering materials. However, plaintiffs separate their claims into distinct counts at the end of the complaint. The allegations of fraud do not convert or contaminate the separate § 11 claims.

None of the cases that defendants cite support their argument that Rule 9(b) applies to § 11 claims that "sound in fraud." Two of these cases apply Rule 9(b) when plaintiffs explicitly blended fraud allegations with claims under § 11 or § 12 in a single count of a complaint. *See Todd v. Oppenheimer & Co.*, 78 F.R.D. 415, 418–24 (S.D.N.Y.1978) (applying Rule 9(b) to Count IX of a complaint, which was brought under both § 12(2) and § 17(a)); *Competitive Assoc. v. Fire Fly Enter., Inc.*, 59 F.R.D. 336, 337–38 (S.D.N.Y.1972) (applying Rule 9(b) to a single count brought under §§ 11, 12(2) and 17(a). In the third case, *FDIC v. National Surety Corp.*, 434 F.Supp. 61, 64 (E.D.N.Y.1977), the court stated that Rule 9(b) only applied to claims against the defendant directors to the extent that fraud was alleged.

█ Defendants also argue that the policies behind Rule 9(b) "apply with full force" to the § 11 claims. Specifically, defendants assert that they need concrete and particularized allegations to enable them to prepare a defense, that the § 11 charges against them harm their reputations, and that Rule 9(b) is needed to inhibit the filing of meritless complaints like this

---

**2.** Liability under § 11 is virtually absolute as to the issuer. The other § 11 defendants have a

due diligence defense. *See* § 11(b)(3) of the 1933 Act, 15 U.S.C. § 77k(b)(3).

one. The short answer to defendants' argument is that the three policies behind Rule 9(b) apply to any charge made against any defendant, to some extent. However, only a defendant facing the particular threat that is posed by an accusation of fraud may invoke the protection of Rule 9(b). Counts I through IV do not charge defendants with fraud, so Rule 9(b) is not available to them.

For the foregoing reasons, the court denies defendants' motion to dismiss Counts I through IV for failure to comply with Rule 9(b).

### C. *Counts I and II and the Statute of Limitations*

Defendants move to dismiss the § 11 claims of Counts I and II for failure adequately to plead compliance with the applicable statute of limitations. That statute requires § 11 suits to be brought within one year of the time that the offense should have been discovered, in the exercise of due diligence. *See* § 13 of the 1933 Act, 15 U.S.C. § 77m.

Defendants contend that Counts I and II present a statute of limitations problem that must be addressed in the complaint. They assert that the § 11 claims of Counts I and II were first filed more than one year after the stock purchases were made.[3] Defendants conclude that the Counts I and II plaintiffs must therefore plead that they could not have known about the violation at the time they purchased the stock. These plaintiffs must also allege that they filed their claims within one year of the date on which due diligence would have led them to discover the offense.

 Plaintiffs argue that no statute of limitations problem exists as to Count II, because all claims in this case began on November 14, 1983 for purposes of the statute. This is the date on which Jack

Bronston filed the first complaint in this case. Plaintiffs are correct that all of the claims asserted in the Bronston complaint are deemed to have been filed on November 14, 1983. *See American Pipe & Constr. v. Utah,* 414 U.S. 538, 552–55, 94 S.Ct. 756, 765–67, 38 L.Ed.2d 713 (1974), *rehr'g denied,* 415 U.S. 952, 94 S.Ct. 1477, 39 L.Ed.2d 568 (1974). However, the Bronston complaint does not state the claims that are now made in Counts I and II of the consolidated complaint that governs this case. Therefore, the filing date of the Bronston complaint does not apply to Counts I and II. *Cf. Ingenito v. Bermec Corp.,* 441 F.Supp. 525, 542 (S.D.N.Y.1977). These Counts instead relate back to the filing dates of the complaints that first state the claims that they contain. Defendants correctly assert that Counts I and II present a statute of limitations problem that the complaint must address.

 Counts I and II do attempt to plead compliance with the statute of limitations. Count I, ¶ 157, states:

> The action on the claims set forth in this Count I was commenced within one year from the time plaintiff discovered, or should have discovered, the misrepresentations and omissions alleged in this Count I and within the time provided in the applicable statute of limitations. Moreover, beginning at a time unknown to plaintiff, but at least as early as March, 1982, the defendants actively and consistently concealed the true facts described in this Complaint.

Paragraph 166 of Count II contains an almost identical attempt to plead compliance with the statute of limitations.

Plaintiffs must be more specific and less conclusory to plead compliance with the statute of limitations set forth in § 13. The complaint must give the time and circumstances of the discovery of the false statement of omission, state the reasons

---

**3.** Specifically, Count I states a claim for all those purchasing stock pursuant to the Dividend Reinvestment Plan offering materials between March 17, 1982 and November 9, 1983. The complaint that first states this claim was filed on March 14, 1984, approximately two years after the initial purchases were made. Count II states a § 11 claim for all those purchasing stock pursuant to the February 17, 1983 offering materials. The complaint that first states this claim was filed on June 28, 1984, more than one year later.

why it was not discovered earlier, and describe plaintiffs' diligent efforts to make or seek the discovery. *See Brick v. Dominion Mortgage & Realty Trust,* 442 F.Supp. 283, 291–92 (W.D.N.Y.1977); *Kroungold v. Triester,* 407 F.Supp. 414, 419 (E.D.Pa. 1975). Paragraphs 157 and 166 of the complaint fail to conform to this standard. For this reason, the court will dismiss Counts I and II for failure adequately to plead compliance with the statute of limitations, unless plaintiffs file an amended complaint that remedies this defect within thirty (30) days of the date of this memorandum opinion and order.

### D. *Negligent Misrepresentation Under Michigan Law*

 Defendants contend that Count VII of the complaint must be dismissed, as Michigan does not recognize a cause of action for negligent misrepresentation in this context. Plaintiffs respond that Michigan courts have long recognized the tort of negligent misrepresentations, and that the tort applies to the facts of this case.

The only Michigan case that analyzes negligent misrepresentation at length is *Williams v. Polgar,* 43 Mich.App. 95, 204 N.W.2d 57 (1972), *aff'd,* 391 Mich. 6, 215 N.W.2d 149 (1974). Plaintiff purchased property from defendant Polgar, who gave them a title abstract that had been prepared for Polgar by the defendant title insurance company's predecessor in interest. Defendant's predecessor had negligently omitted a deed from the abstract, and this negligence damaged plaintiffs. The court of appeals held that an abstractor is liable for negligent misrepresentation to third parties who foreseeably rely on the abstract. In rejecting the argument that the plaintiff must be in privity with the abstractor, the court stated:

> The strongest argument for a privity requirement is that if there were no such requirement the abstractor would be open to virtually unlimited liability. Whatever the situation is with regard to other professional certificates we do not believe that this is true of abstracts. Abstracts are prepared for a limited class, among them purchasers and mortgagees. The abstractor knows this and certainly is aware that future purchasers and mortgagees will rely on his abstract. Thus, the class to whom the duty is owed is clearly defined. Moreover, there is a limit on the amount for which the abstractor may be held liable. For example, in a case where the abstractor has failed to note a deed conveying the property in fee simple absolute and the subsequent purchaser loses the property, that limit is the total value of the property. Contrast this with a case involving an accountant's certificate. Here an unlimited number of people may rely on the certificate in extending credit and the liability is truly unlimited.

43 Mich.App. at 100–101, 215 N.W.2d 149 (footnote omitted). The Michigan Supreme Court affirmed the court of appeals, "adopt[ing] the tort of negligent misrepresentation in this context." 391 Mich. at 21.

Defendants argue that the tort of negligent misrepresentation recognized in *Williams* is limited to the context of title abstracts. The court disagrees. The cases cited by defendants do not confine *Williams* to its facts [4] and defendants give no logical reason for such a limitation.

---

**4.** Defendants cite *Friedman v. Dozorc,* 412 Mich. 1, 312 N.W.2d 585 (1981) to support their limitation of *Williams.* Friedman found that an attorney owed no duty of reasonableness in initiating lawsuits to the adversary of the attorney's client. The court concluded that the creation of such a duty would violate public policy by undermining the attorney's role in the adversary system as the representative of the client. 412 Mich. at 22–30, 312 N.W.2d 585. The court does cite *Williams* and describe its title abstractor setting. However, *Williams* is cited for the proposition that privity no longer shields professionals from liability to foreseeable third parties, and for the proposition that reliance is an appropriate factor to consider in deciding if a professional owes a duty of care to another. *Id.* at 28 nn. 13–14, 312 N.W.2d 585. *Friedman* thus fails to limit *Williams* in any way.

Defendants also cite *Disner v. Westinghouse Elec. Corp.,* 726 F.2d 1106 (6th Cir.1984) to support their conclusion that Michigan recognizes no cause of action for negligent misrepresentation in this context. Defendants refer only to a

The conclusion that negligent misrepresentation extends beyond the context of title abstracts does not mean, however, that the tort applies here. The court of appeals in *Williams* explicitly found that privity was unnecessary, as defendant would be liable only for a limited amount and only to a small and defined class of potential plaintiffs. In contrast, recognizing a cause of action for negligent misrepresentation here would expose defendants to a virtually unlimited amount of liability to any member of the public who happened to buy Consumers stock during a given period.

Courts interpreting New York law have faced this very problem. The seminal case is an opinion by Chief Judge, later Justice, Cardozo in *Ultramares Corp. v. Touche*, 255 N.Y. 170, 174 N.E. 441 (1931). In *Ultramares*, the defendant accountant negligently prepared a balance sheet. Plaintiff was a member of a broad group of investors and creditors who had examined the sheet. Judge Cardozo found that the accountant was not liable to plaintiff for negligent misrepresentation. He reasoned that mere negligence should not render someone liable to a limitless group of potential plaintiffs. However, the *Ultramares* approach permits liability for negligent misrepresentation when there is a link between plaintiff and defendant to limit the potential liability and to make its imposition more just. These links include privity, a bond so close as to approach privity, or a fiduciary duty. *See In re Coleco Sec. Litig.*, 591 F.Supp. 1488, 1492 (S.D.N.Y.1984).

Recent opinions have applied *Ultramares* to negligent misrepresentation claims made in cases similar to the present one. In *Mallis v. Bankers Trust Co.*, 615 F.2d 68 (2d Cir.1980), *cert. denied*, 449 U.S. 1123, 101 S.Ct. 938, 67 L.Ed.2d 109 (1981), plaintiffs charged defendants with securities fraud. Plaintiffs also claimed that defendants had negligently misrepresented certain facts about the securities to them. The Second Circuit found a cause of action for negligent misrepresentation under New York law, but based this holding on the "direct dealings" between defendants and plaintiffs. The court found that the plaintiffs "seek 'redress, not as a mere member of the public, but as one of a settled and particularized class among the members of which the [information] would be circulated for [a] specific purpose,' *White v. Guarente, supra,* 43 N.Y.2d at 363, 401 N.Y. S.2d at 479, 372 N.E.2d at 320. In short, granting [plaintiffs] a negligent misrepresentation remedy in no way threatens to open the floodgates of liability as feared by Judge Cardozo in *Ultramares, supra."* 615 F.2d at 82.

A recent opinion by the District Court for the Southern District of New York, *In re Coleco Sec. Litig., supra,* makes the limits of the negligent misrepresentation tort recognized in *Mallis* clear. In *Coleco*, purchasers of Coleco stock sued the officers of the company for federal securities fraud, negligent misrepresentation, and common law fraud for making false statements about the Adam home computer. The court dismissed the negligent misrepresentation claims under both New York and Connecticut law, reasoning that such a claim "proceeds on behalf of a classically 'faceless or unresolved class of persons,' prospective investors, and must be dismissed under the reasoning of *Ultramares* and *Guarante.* . . . Plaintiffs have put forward no support for an extension of director's liability to the investing community, nor are we aware of any." 591 F.Supp. at 1493. The court then turned from the law of New York to that of Connecticut, and found Connecticut law to be identical on this point. Although the Connecticut courts had not produced an *Ultramares*, their cases recognizing negligent misrepresentation fit within Judge Cardozo's framework. *Id.* at 1493–94.

footnote in *Disner* that describes the elements of claims of intentional misrepresentation and innocent misrepresentation under Michigan law. Defendants argue the *Disner's* failure to discuss negligent misrepresentation "implicitly recognize[s] that no such general cause of action has been adopted by the Michigan courts." This court declines defendants' invitation to rely on the negative implications, if any, of a footnote in *Disner*.

Like the Connecticut courts, the Michigan courts have not produced an *Ultramares*. However, the court of appeals in *Williams* explicitly voiced Judge Cardozo's reluctance to impose vast and almost limitless liability on a defendant because of mere negligence. This court concludes, therefore, that the Michigan courts do not recognize a cause of action for negligent misrepresentation in the context of this case. Accordingly, Count VII of the complaint must be dismissed.[5]

### E. *Allegations Made In Particular Paragraphs*

■ Defendants next move to dismiss particular paragraphs of the complaint for failure to state a claim. They attack plaintiffs' allegations about the false and misleading nature of excerpts taken from Consumers' offering materials, such as the prospectuses and the documents that they incorporate by reference. Defendants assert that no reasonable juror could interpret the challenged language in the way that plaintiffs suggest; that the defects in the language used, if any, are not material; and that some of the alleged misrepresentations and omissions deal with topics that the challenged excerpt does not even discuss.

It is inappropriate for the court to strike various allegations from the complaint at this early stage in the litigation. Plaintiffs have alleged a continuing conspiracy by defendants to inflate stock values and induce stock purchases by disseminating documents misrepresenting facts known to defendants at the time about the current status and future prospects of the Midland plant. It is impossible for the court to determine at this point what defendants knew, when they knew it, and how that knowledge diverges from the content of the offering materials. Moreover, defendants may have disseminated certain doc-

uments that are truthful in and of themselves to further their alleged conspiracy to sell the inflated stock to the investing public. The court therefore denies defendants' motion to dismiss particular paragraphs of the complaint at this time.

While discussing the particular allegations of the complaint, however, the court should note its agreement with defendants on one point. Some of plaintiffs' allegations about the false and misleading nature of the various disclosure documents could be improved. When amending their complaint to comply with other sections of this opinion, plaintiffs should review their allegations and revise them to enhance clarity and directness. Plaintiffs frequently did a better job of stating the basis for their claims in their litigation briefs than they did in their original complaint. The revised complaint should certainly incorporate the additional thought that plaintiffs have given to their particular allegations. Plaintiffs should also use the objections raised by defendants as a guide for improving the allegations that they choose to retain in their new complaint. Finally, plaintiffs have had time to learn about the case since they filed their complaint, and this should help them focus and revise their specific allegations in light of the provisions of new Fed.R.Civ.P. 11.

### F. *Vague and Indefinite Allegations*

Defendants ask the court to dismiss plaintiffs' claims to the extent that they rely on vague and indefinite allegations. They point to ¶¶ 123(c) and (d), 127(c) and (d), and 127(c) and (d) of the complaint. There plaintiffs list some of the documents that the February, 1983, June, 1983, and October, 1983 Prospectuses incorporate by reference. Defendants assert that plaintiffs have failed to allege that the specific documents listed in these paragraphs con-

---

**5.** Defendants also move for the dismissal of Count VII for failure to state fraud with particularity, as required by Rule 9(b). They argue, as they did for the § 11 claims, that Rule 9(b) applies to Count VII because it "sounds in fraud." However, fraud is no more an element of a claim for negligence than it is of a claim under § 11. *See* the discussion at Part II.B. *supra*. Thus, the particularity requirement of Rule 9(b) does not apply to Count VII.

tain any misstatements or omissions.[6] Defendants also object to allegations in the complaint that particular statements "were false and misleading in at least the following respects ... [7] They ask the court to limit plaintiffs' allegations to the specific misstatements or omissions that plaintiffs identify in particular documents.

 Defendants are correct that plaintiffs have stated claims only as to documents that are specifically named in the complaint, and only where plaintiffs identify the manner in which they allege the documents to be false and misleading. *See, e.g. Todd v. Oppenheimer & Co., supra,* at 420 (invoking Fed.R.Civ.P. 9(b).[8] The court need not grant defendants' motion to dismiss, however, as plaintiffs agree that the challenged language states no claims. Plaintiffs explain that the list of documents incorporated by reference is a description of the prospectuses in question, not an attempt to state additional claims. As to the expansive language challenging documents "in at least the following respects," plaintiffs state that they "are merely announcing that they have made all of the allegations which can be made at this time, that they believe additional information will become available to them, and when it does, that they intend to amend their pleadings accordingly."

### G. *Conclusion*

The court grants defendants' motion to dismiss Count VII of the complaint for failure to state a claim under Michigan law. Defendants' motion is denied in all other respects, provided that plaintiffs submit an amended complaint that complies with this memorandum opinion and order within thirty (30) days of the date of this order. If no amended complaint is filed, the court will dismiss Counts I and II for failure adequately to plead compliance with the statute of limitations, and Counts V and VI for failure to plead fraud with sufficient particularity.

## III. MOTION FOR CERTIFICATION OF FIVE PLAINTIFF CLASSES

### A. *Background*

Plaintiffs move for the certification of five plaintiff classes under Fed.R.Civ.P. 23(b)(3). The first proposed plaintiff class is called the "Dividend Reinvestment Class." It includes all purchasers of Consumers stock pursuant to the March 17, 1982 Dividend Reinvestment Plan Prospectus. The purchases occurred between March 17, 1982 and November 9, 1983. The class asserts Count I of the complaint, which is a claim under § 11 of the 1933 Act. Dr. Abraham Lubowitz seeks to represent this class.

The second proposed plaintiff class is called the "February Prospectus Class." It includes all who purchased stock pursuant to the February 17, 1983 Prospectus. This class asserts Count II of the complaint, which is a § 11 claim. Myron and Gertrude Grodin seek to represent this class.

The third proposed plaintiff class is known as the "June Prospectus Class." It encompasses all purchasers pursuant to the June 21, 1983 Prospectus. The class as-

---

**6.** In ¶¶ 123(c), 127(c), and 133(c), plaintiffs list the Form 8-K Reports that are incorporated by reference into the particular prospectus identified at the beginning of each of these paragraphs. In ¶¶ 123(d), 127(d), and 133(d), plaintiffs list "[a]ll documents filed by Consumers Power pursuant to the Exchange Act" after the date of the prospectus and before the end of the offering in question. Plaintiffs fail to allege specific defects in these 8-K Reports, or even to identify the other documents to which they refer. *See also* ¶ 79(c) of the complaint, which resembles the subpart (d) allegations described above.

**7.** Defendants find such general allegations in ¶¶ 82, 84, 86, 92, 96, 102, 108, 124, 128, and 134 of the complaint.

**8.** Plaintiffs should identify the statements or omissions they allege to be false and misleading, to state both a claim for fraud and to state a § 11 claim. The fraud claims are governed by the particularity requirement of Fed.R.Civ.P. 9(b), as discussed in Part II.A. *supra.* Although the § 11 claims do not fall with Rule 9(b), see Part II.B. *supra,* plaintiffs must still identify the part of the registration statement that they challenge and describe the material misstatement or omission to state a claim under § 11. *See* § 11(a), 15 U.S.C. § 77k(a).

serts Count III of the complaint, which is another § 11 claim. Plaintiffs Dr. Shirley Sherrod and Rhoda Fineman seek to represent this class.

The fourth proposed plaintiff class is called the "October Prospectus Class." It consists of all who bought stock pursuant to the October 13, 1983 Prospectus. This class asserts Count IV, a § 11 claim. Plaintiffs Anne Mary Weil and J. Norman Lewis are the proposed class representatives.

The fifth proposed plaintiff class is called the "Misrepresentation Class." It consists of all those who bought Consumers stock on the open market from March 17, 1982 through November 9, 1983. This class asserts the two remaining counts of the complaint: Count V under § 10(b) and Rule 10b–5, and Count VI for common law fraud and deceit.[9] Plaintiffs Dr. Abraham Lubowitz and Rhoda Fineman seek to represent this class.

■■■ Plaintiffs base their class certification motion on Fed.R.Civ.P. 23. Rule 23(a) contains four prerequisites that must be satisfied for a lawsuit to proceed as a class action. The Rule provides:

> **(a) Prerequisites to a Class Action.** One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

The burden of showing the satisfaction of all four of the prerequisites of Rule 23(a) falls on the party seeking to utilize the class action device. *See, e.g., Senter v. General Motors Corp.*, 532 F.2d 511, 522 (6th Cir.1976), *cert. denied,* 429 U.S. 870, 97 S.Ct. 182, 50 L.Ed.2d 150 (1976).

In addition to the requirements of Rule 23(a), plaintiffs must demonstrate that this case falls within the guidelines of Rule 23(b). That Rule provides:

> **(b) Class Actions Maintainable.** An Action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:
>
> . . . . .
>
> (3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

It is important to emphasize that the class action or representative suit predates Rule 23 and its specific requirements. Class action suits began as bills of peace in equity involving multiple parties. Such bills would be brought when, for example, a lord of the manor appropriated village common lands to the loss of the manorial tenants, or when a vicar quarrelled with his parishioners about tithes:

> In such situations, each member of the multitude had the same interest at stake as every other member, so that it was an obvious waste of time to try the common question of law and fact over and over in separate actions at law between the vicar and one parishioner after another, the lord and one tenant after another, and so on. It was much more economical to get everybody into a single chancery suit and

---

**9.** The Misrepresentation Class also asserts Count VII of the complaint, the state law claim of negligent misrepresentation. Michigan law does not recognize this cause of action under the facts of the present case, however. *See* Part II.D. *supra.*

settle the common questions once and for all.

Z. Chaffee, Jr., Some Problems of Equity 201 (1950).

The need for class action suits has grown over time, and applies to the more complicated legal problems faced by modern courts. The class action device is particularly useful in cases like the present one. In *Escott v. Barchris Constr. Corp.*, 340 F.2d 731, 733 (2d Cir.1965), the Second Circuit recognized the importance of the class action procedure to small stockholders scattered throughout the country:

> In our complex modern economic system where a single harmful act may result in damages to a great many people there is a particular need for the representative action as a device for vindicating claims which, taken individually, are too small to justify legal action but which are of significant size if taken as a group. In a situation where we depend on individual initiative, particularly the initiative of lawyers, for the assertion of rights, there must be a practical method for combining these small claims, and the representative action provides that method.

The SEC has also endorsed the use of the class action device to remedy a wrong shared by a large group of stockholders:

> Since the enforcement activities of this Commission do not serve to make whole investors who have been injured by a fraudulent course of business and since it is economically impracticable in many instances for investors individually to pursue available remedies, the representative action appears to provide the most meaningful method by which their claims may be pursued and the Congressional policy favoring such remedies may be vindicated.

*Dolgow v. Anderson*, 43 F.R.D. 472, 483–84 (E.D.N.Y.1968) (quoting amicus brief of SEC).

The drafters of Rule 23 recognized the need for representative or class action suits to redress modern wrongs like the one alleged here. They designed Rule 23 to codify, crystallize and circumscribe class actions to provide judges and attorneys with guidance in certifying classes. The prerequisites and requirements of Rule 23 direct attention to factors that time and experience have deemed to be crucial or troublesome. The structure of Rule 23 therefore ensures that a court will consider certain vital matters, satisfying itself that any major difficulties have been resolved, before it allows a case to proceed as a class action.

The court will first apply the requirements of Rule 23 to the first four proposed plaintiff classes, which consist of those buying stock pursuant to the four registered offerings in question. These four groups, each asserting a § 11 claim, will be discussed and analyzed together. Rule 23 will then be applied to the fifth proposed plaintiff class, consisting of open market stock purchasers, which asserts federal and state claims of securities fraud.

### B. *The Four § 11 Proposed Plaintiff Classes*

#### 1. *Rule 23(a): Numerosity, Common Questions, Typicality*

 It is clear that the four § 11 classes satisfy the first three prerequisites of Rule 23(a). The numerosity requirement is met when plaintiffs demonstrate that the number of potential class members is large, even if plaintiffs do not know the exact figure. *See Piel v. National Semiconductor Corp.*, 86 F.R.D. 357, 365 (E.D. Pa.1980). Plaintiffs have made that showing here. Defendants sold over one and one half million shares of stock pursuant to the Dividend Reinvestment Plan. They sold twelve million shares in the February, June and October, 1983 stock offerings. Exhibit B to Consumers' opposition brief lists 247,664 shareholders of record as of December 31, 1983. The first four plaintiff classes are sufficiently numerous to satisfy Rule 23(a). *See, e.g., International Union v. Acme Precision Prod.*, 515 F.Supp. 537, 540 (E.D.Mich.1981) (class of 78 members is sufficient); *Michigan State Univ. Faculty Ass'n v. Michigan State Univ.*, 93 F.R.D. 54, 56 n. 1 (W.D.Mich.1981) ("[W]hen a

class numbers in the hundreds or thousands the impracticability of joinder is obvious ...").

Rule 23(a) also requires that the proposed class members present common questions of law and fact. This requirement is satisfied here, as all of the members of each of the proposed § 11 classes allege identical misstatements and omissions as well as a common theory of liability.

The typicality requirement of Rule 23(a) is also fulfilled. Typicality exists when the class representative presents issues common to the class, and the representative's position on those issues is not antagonistic to the position of the other class members. *See, e.g., Lewis v. Capital Mortgage Invs.,* 78 F.R.D. 295, 301 (D.Md.1977). Here, the named plaintiffs assert claims that are typical of every class member. All must prove that their respective prospectus was false or misleading, and that the misrepresentations and omissions artifically inflated the value of their stock. In other words, the injury suffered by the named plaintiffs emanates from the same source as the injury of all other class members, and all plaintiffs must prove the same conduct by defendants in order to recover.

### 2. *Rule 23(a): Adequacy of the Proposed Class Representatives*

The fourth and final requirement of Rule 23(a) is that the named plaintiff must fairly and adequately represent the interest of the class. This requirement is indispensable protection for absent class members. Despite its convenience, the class action suit completely "disregard(s) the requirement that a man ought to have his day in court—his rights and duties should not be adjudicated in his absence." Z. Chaffee, *supra,* at 203. As the named plaintiffs seek to represent absent parties in binding litigation, the court must examine their adequacy with care. "Incompetent or dishonest or halfhearted representatives merely bring about the injury of all." *Id.* at 232.

Defendants vigorously contest the adequacy of the proposed representatives of the four § 11 plaintiff classes. The first proposed representative is Dr. Abraham Lubowitz, who wants to litigate on behalf of the Dividend Reinvestment Class.

#### a) *Dr. Abraham Lubowitz (Dividend Reinvestment Class)*

Dr. Lubowitz is a retired dentist who bought Consumers stock in his capacity as plan administrator and trustee of the A.H. Lubowitz DDS Association Employees Pension Plan & Trust. He caused the trust to buy 311.419 shares of Consumers stock pursuant to the Dividend Reinvestment offering materials between March 17, 1982 and August 31, 1983. Dr. Lubowitz realized that the stock might be in trouble after reading an article in a Philadelphia newspaper about Consumers' difficulties with the Midland plant. He concluded that he and the other investors had not been informed of the problems. Dr. Lubowitz then contacted his lawyer of 30 years, Mr. Harvey Kronfeld of the Philadelphia law firm of Rawle & Henderson. As a result, Dr. Lubowitz seeks to represent the Dividend Reinvestment Class, and Rawle & Henderson is one of the law firms representing the plaintiffs in this case. Dr. Lubowitz has testified that he is willing and able to pay his share of the litigation costs, that he will keep himself informed of the progress of this litigation, and that he is willing to attend court proceedings and depositions, if invited.

Defendants first assert that Dr. Lubowitz is inadequate because his longtime lawyer, Mr. Kronfeld, is also his son-in-law. They contend that this relationship creates an unacceptable conflict of interest for Dr. Lubowitz. Defendants claim that Mr. Kronfeld stands to make more in attorneys fees than Dr. Lubowitz could recover as a plaintiff. This raises the possibility the Dr. Lubowitz could put the interests of Mr. Kronfeld ahead of those of himself and the absent class members. For example, Dr. Lubowitz could be overly generous with the money obtained by the class in awarding an attorneys fee to Mr. Kronfeld or his law firm.

Plaintiffs vehemently deny that the relationship between Dr. Lubowitz and Mr. Kronfeld creates a problem. They assert that Dr. Lubowitz is completely financially independent from his son-in-law, and conclude from this that Dr. Lubowitz lacks any interest in the potential fee award to Mr. Kronfeld. Plaintiffs argue that Dr. Lubowitz should be allowed to turn to his longtime lawyer, who has experience in class action litigation. They argue that both Dr. Lubowitz and Mr. Kronfeld are men of integrity who would not be swayed by a conflict of interest, if one exists. Plaintiffs also point out that the court can protect class members through its supervisory power under Fed.R.Civ.P. 23(e) over any settlement reached in this case.

Both sides cite numerous cases to support their respective positions. *Compare Shroder v. Suburban Coastal Corp.*, 729 F.2d 1371, 1375–76 (11th Cir.1984) (rejecting a proposed class representative who was primarily employed by the class counsel's law firm); *Susman v. Lincoln American Corp.* 561 F.2d 86, 90–96 (7th Cir.1977) (rejecting proposed representatives who included law partners and relatives of one of plaintiffs' attorneys); and *Turoff v. May Co.*, 531 F.2d 1357, 1360 (6th Cir.1976) (rejecting four proposed representatives when three of them were attorneys with plaintiffs' law firm and the fourth was the wife of one of them) *with Lewis v. Goldsmith*, 95 F.R.D. 15, 20–21 (D.N.J.1982) (accepting named plaintiff represented by his uncle and the uncle's law firm); *Clark v. Cameron-Brown Co.*, 72 F.R.D. 48, 54–57 (M.D.N.C.1976) (accepting class representative who was also head counsel for plaintiffs); and *Lamb v. United Sec. Life Co.*, 59 F.R.D. 25, 30–31 (S.D.Iowa 1972) (accepting individual as both plaintiff and attorney).

Both Dr. Lubowitz and Mr. Kronfeld appear to be competent, experienced, and honest men who have contributed to their communities. The court is confident that Dr. Lubowitz will more than adequately represent the Dividend Reinvestment Class in this litigation. However, a class representative should not be related to one of the lawyers for the class. Such a relationship, even between individuals like Dr. Lubowitz and Mr. Kronfeld, creates an appearance of impropriety which should be avoided whenever possible.

Mr. Kronfeld, in his letter to the court of February 15, 1985, states that he is "but a small part of the larger team of plaintiffs' lawyers." In contrast, Dr. Lubowitz is the only plaintiff who seeks to represent the Dividend Reinvestment Class. It appears, then, that Dr. Lubowitz plays a larger and more important role in this litigation than does Mr. Kronfeld. Accordingly, the court deems Dr. Lubowitz to be an adequate representative of the Dividend Reinvestment Class, provided that Mr. Kronfeld and Rawle & Henderson withdraw from the group of plaintiffs' attorneys within thirty (30) days of the date of this memorandum opinion and order. This arrangement provides the Dividend Reinvestment Class with an adequate representative while avoiding the appearance of impropriety. A class representative stands in a special relationship to the members of the class. There must be nothing about him or her that will cast doubt on the representative's ability to protect the interest of the class. It is for this reason the court indicates that the presence of a relative attorney might be misunderstood by members of the class and will not be approved.

██ Defendants argue that Dr. Lubowitz is inadequate for another reason. They point out that Dr. Lubowitz owns Consumers shares that he purchased outside of the class period. Defendants contend that the value of these shares would decline if Consumers had to pay the plaintiffs a large settlement or judgment in this case. They conclude that Dr. Lubowitz is inadequate as a class representative, as he might not prosecute this case vigorously in order to protect the value of his holdings.

Defendants cite one case that supports their argument.[10] In *Wood v. Rex-Noreco,*

10. Defendants also cite *Ruggiero v. American* *Bioculture, Inc.,* 56 F.R.D. 93 (S.D.N.Y.1972). In

*Inc.,* 61 F.R.D. 669 (S.D.N.Y.1973), the plaintiffs held 6,000 shares obtained outside of the class period and 2,900 shares purchased within the class period. The court found the plaintiffs to be inadequate as class representatives, commenting that "as holders of the 6,000 shares purchased prior to [the alleged misrepresentations], plaintiffs also have a substantial shareholder interest in Rex-Noreco's remaining an ongoing enterprise. In view of these substantial and conflicting interest, the plaintiffs have not shown that they can adequately protect the interest of the class …" 61 F.R.D. at 674.

Plaintiffs argue that Dr. Lubowitz's holdings do not present a conflict of interest. They cite cases where courts have allowed plaintiffs who purchased and retained securities to represent all purchasers of the securities, including those who later sold their holdings in the company. *See, e.g., Herbst v. International Tel. & Tel. Corp.,* 495 F.2d 1308, 1314–15 (2d Cir. 1974); *Herbst v. Able,* 47 F.R.D. 11, 15 (S.D.N.Y.1969). While these cases are not quite on point,[11] the court agrees that Dr. Lubowitz is adequate. Dr. Lubowitz is quite capable of calculating whether or not this lawsuit will hurt him more as an ongoing shareholder than he would gain from being a class action plaintiff. Quite possibly, he has concluded that the value of Consumers stock is already so depressed that the outcome of this case will not cause

a further decline. For whatever reason, Dr. Lubowitz has testified about his desire not only to be a plaintiff, but to represent plaintiff classes. The court is satisfied that Dr. Lubowitz will fairly and adequately represent the Divident Reinvestment Class.

### b) *Myron and Gertrude Grodin (February Prospectus Class)*

■ Defendants contend that Myron and Gertrude Grodin are inadequate and should not be permitted to represent the second § 11 plaintiff class, the February Prospectus Class. They contend that Mr. Grodin is unacceptable because he is too old and sick. Defendants point out that Mr. Grodin is 72 years old, that he had a hernia and prostate operation during 1984, and that he is under a doctor's care for dizzy spells. Courts have rejected proposed class representatives, relying in part on their poor physical condition. *See e.g., Roundtree v. Cincinnati Bell, Inc.,* 90 F.R.D. 7, 10 (S.D.Ohio 1979). However, courts have also accepted class representatives far less healthy than Mr. Grodin. *See, e.g., Ross v. A.H. Robins Co., Inc.,* 100 F.R.D. 5 (S.D.N.Y.1982). Mr. Grodin does not regard his health problems as serious, and is eager to serve as a class representative. The court is satisfied that Mr. Grodin's physical problems do not render him inadequate.

---

*Ruggiero,* the court denied a motion for class certification. One of the reasons given was "the fact that the Freed plaintiffs still hold a substantial equity interest in American Bioculture which may well outweigh any *personal* interest they have in successfully prosecuting the class action claim." 56 F.R.D. at 95 (emphasis in original). The two *Ruggiero* plaintiffs first sued derivatively on behalf of the corporation, and then brought a securities fraud action against the corporation and sought certification as class representatives. The court found it "difficult to see how the Freed plaintiffs can reconcile their existing duties to Bioculture and its present shareholders as derivative plaintiffs with the duties which they seek to assume on behalf of a class which attacks Bioculture and embraces persons who now hold no Bioculture shares." *Id.* Plaintiffs correctly point out that Dr. Lubowitz is not suing derivatively on behalf of

Consumers. Therefore, he has less of a conflict of interest than that of the *Ruggiero* plaintiffs.

11. These cases address the situation where the proposed class representative and the rest of the class all bought within the class period, and some retained their stock while others sold it. While those who kept the stock are current shareholders with an ongoing financial stake in the corporation, they are also seeking damages for *all* of the shares that they own. In the present case, the proposed representative bought shares outside of the class period. Thus, Dr. Lubowitz seeks damages for only *some* of the shares that he now holds. This means that Dr. Lubowitz has a larger ongoing stake in the corporation, relative to the amount of damages he seeks in the present litigation, than had the proposed representatives in these cases.

■ Defendants also claim that Mr. Grodin is mentally incompetent. They assert that he cannot answer simple questions and that he has no conception of the claims that he is supposedly making in this case. The court has reviewed Mr. Grodin's deposition testimony, and concludes that Mr. Grodin is competent and possesses a lay understanding of the issues raised in this case.

Next is the issue of Mrs. Grodin's adequacy to serve as a class representative. Defendants argue that Mrs. Grodin is inadequate because she would merely be a rubber stamp for the decisions reached by her husband and her attorneys. They point out that Mrs. Grodin defers to her husband in financial matters, and did not participate in the decision to buy Consumers stock. Defendants support their argument by citing cases that find proposed class representatives inadequate because of their ignorance of the factual circumstances and progress of their claims. *See, e.g., Seiden v. Nicholson*, 69 F.R.D. 681, 688–89 (N.D.Ill.1976); *In re Goldchip Funding Co.* 61 F.R.D. 592, 594–95 (M.D.Pa.1974).

■ Plaintiffs deny that Mrs. Grodin will merely be a rubber stamp. They point out that Mrs. Grodin has shown interest in the case and is aware of her responsibilities as a class representative. Mrs. Grodin thinks that she and her husband lost money on their investment in Consumers because of defendants' conduct, and brings her claim in good faith. Plaintiffs cite cases holding that a class representative need not possess a detailed knowledge of the case, as it is unrealistic to expect laymen to offer their attorneys much assistance in conducting sophisticated litigation. *See, e.g., Pellman v. Cinerama, Inc.*, 89 F.R.D. 386, 390 (S.D.N.Y.1981); *Simon v. Westinghouse Elec. Corp.*, 73 F.R.D. 480, 485–6 (E.D.Pa. 1977).

After reviewing these arguments, the court concludes that Mrs. Grodin's complete deference to her husband in financial matters suggests that she should not be the sole representative of a plaintiff class. However, Mrs. Grodin may represent the February Prospectus Class in conjunction with her husband. Mr. and Mrs. Grodin together will provide the class and its attorneys with an independent source of factual knowledge and opinions that will benefit the class.

c) *Dr. Shirley Sherrod (June Prospectus Class)*

■ Defendants argue that Dr. Sherrod is too busy to be an adequate class representative. They point out that she sees 200 patients in each of her 72 hour work weeks as a practicing ophthalmologist. In addition, she donates five hours per week to the Greater Detroit Society of the Blind, is the single parent of a nine-year-old, and belongs to an investment club. Defendants complain that Dr. Sherrod's deposition had to be postponed a number of times to accommodate her busy schedule.

Plaintiffs point out that Dr. Sherrod was not too busy to obtain counsel to represent her in this case, and that she attended her eight hour long deposition. Dr. Sherrod has indicated that she will find the time to participate actively in this litigation. The court takes Dr. Sherrod at her word. Representing a class does require a time commitment, and the court is satisfied that Dr. Sherrod understands and accepts this.

Defendants also object to Dr. Sherrod because of "her lack of cooperation, induced by her counsel, in even exploring" certain topics at her deposition. It appears that defendants are upset by Dr. Sherrod's refusal to answer questions after her attorneys instructed her, probably improperly on at least some occasions, to be silent. This objection should be directed against plaintiffs' attorneys rather than against Dr. Sherrod. A layperson cannot reasonably be expected to know when to answer and when to remain silent.

■ Finally, defendants argue that Dr. Sherrod "lacks the basic honesty and credibility required of a person who seeks to occupy the fiduciary role of class representative." They point to a minor inconsistency in the testimony that Dr. Sherrod

gave in her eight hour deposition.[12] This does not alter the court's conclusion that Dr. Sherrod will fairly and adequately represent the June Prospectus Class.

#### d) *Rhoda Fineman (June Prospectus Class)*

■ Defendants contend that Rhoda Fineman will not fairly and adequately represent the June Prospectus Class because she is too dishonest. The basis for this attack is the method Mrs. Fineman used to obtain copies of her trading records for her Consumers stock to help prepare for this lawsuit. Mrs. Fineman needed to get these records from her brokerage firm, which is a member of at least one of the proposed defendant classes. As she thought that the reason she wanted the records was none of her broker's business, Mrs. Fineman told her broker that she wanted the trading records for tax purposes.

To support their argument that Mrs. Fineman's dishonesty makes her inadequate, defendants cite cases rejecting proposed class representatives on ethical grounds. Even a quick reading of these cases reveals, however, that the rejected individuals have very little in common with Mrs. Fineman. *See, e.g., Kline v. Wolf,* 702 F.2d 400, 403 (2d Cir.1983) (rejecting a plaintiff who had testified that he relied on a report which he now admits did not exist at the time); *Kornick v. Talley,* 86 F.R.D. 715, 721 (N.D.Ga.1980) (rejecting trustees who had violated their fiduciary duties by helping themselves to interest-free loans from the trust); *Amswiss Int'l Corp. v. Heublein, Inc.,* 69 F.R.D. 663, 669–671 (N.D.Ga.1975) (rejecting proposed representatives who had been convicted of federal securities violations and had specifically been found not to be credible witnesses). As plaintiffs point out, Mrs. Fineman did not even lie under oath in the present case.

The court is confident that Mrs. Fineman will fairly and adequately discharge her duties as a class representative.

#### e) *Anne Mary Weil (October Prospectus Class)*

■ Defendants raise the same objection to Mrs. Weil that they raised to Mrs. Grodin. They contend that Mrs. Weil is inadequate because her husband makes all of the investment decisions, and because she knows nothing about Consumers except that it is a utility. Plaintiffs point out that Mrs. Weil, a bookkeeper, was actively involved with the couple's investments. She kept track of each investment, recorded the dividends, noticed that the Consumers stock had declined in value, and advised her husband to sell it. Mrs. Weil also asked her husband to telephone Smith Barney, their broker, and find out what had gone wrong with their Consumers investment.

As with Mrs. Grodin, plaintiffs do not ask that Mrs. Weil be accepted as the sole representative of the October Prospectus Class. Plaintiffs ask that both Mrs. Weil and Mr. Lewis, who is more knowledgable about Consumers and who made the investment decision for himself, represent this class. With this understanding, the court finds Mrs. Weil to be an adequate representative of the October Class.

#### f) *J. Norman Lewis (October Prospectus Class)*

■ Mr. Lewis is allegedly inadequate as a class representative for one of the reasons that defendants objected to Dr. Lubowitz. Defendants argue that Mr. Lewis' ownership of Consumers shares purchased outside of the class period creates an unacceptable conflict of interest. They point out that Mr. Lewis currently holds 4,000 shares of Consumers stock.

---

**12.** Dr. Sherrod first stated that her broker told her that he knew that she was looking for sound and conservative investments and that she should consider Consumers Power. Later in the deposition, the attorney for Consumers asked her if her broker had told her that he had selected Consumers as a conservative and safe stock. Dr. Sherrod denied that he had said this. Later, Dr. Sherrod stated that she could not remember the precise words that were used. She then said that the broker had not told her that he knew that she was looking for conservative and safe stock and that she should consider Consumers in that regard.

Only 800 of these shares were acquired during the class period.

As with Dr. Lubowitz, the court finds that Mr. Lewis' stock holdings will not interfere with his loyalty to the class. Mr. Lewis is therefore an adequate representative of the October Prospectus Class.

g) *All Proposed Class Representatives*

■ Defendants protest that plaintiffs have failed to show that any of the proposed representatives is willing or able to bear the expenses of this litigation. Plaintiffs respond to this by attaching to their reply brief a schedule of the minimum net worths of each of the named plaintiffs. They also note that each of the proposed class representatives has testified as to his or her willingness to pay costs.

The court wants to make sure that plaintiffs' attorneys have adequately informed the proposed class representatives about their obligation to pay the costs of this litigation. The court, by earlier order, required the filing of a statement of proposed expenses by the plaintiffs and a budget. Therefore, the court conditions its finding that the proposed representatives are adequate on the submission of statements in writing by each of them. The statements should indicate that the proposed representative has seen the statement of expenses submitted in this case and the budget of the plaintiffs has knowledge of the possible amount of the obligation that might be imposed if the plaintiffs do not succeed, and is willing to pay all costs and expenses if necessary. The statement should be submitted within thirty (30) days of the date of this memorandum opinion and order.

3. *Rule 23(b): Predominance of Common Questions; Superiority*

■ The four § 11 plaintiff classes must satisfy the requirements of Rule 23(b) that common questions of law and fact predominate, and that a class action is superior to other available methods for trying this case. Courts generally find that predominance requirement satisfied when the issue of liability is common to the class. When important common liability issues are present, the existence of secondary, individual issues should not defeat class certification. *See Dura-Bilt Corp. v. Chase Manhattan Corp.*, 89 F.R.D. 87, 93 (S.D.N.Y.1981). *See also Steiner v. Equimark Corp.*, 96 F.R.D. 603, 611–12 (W.D. Pa.1983).

■ In the present case, each § 11 class must show the existence of material misstatements or omissions in its prospectus to show liability. The necessary proofs will be the same for each class member. Therefore, common issues of liability are shared by all class members, and the predominance requirement is satisfied.

■ The class action device is also superior to alternative methods, such as joinder, intervention and test case, for resolving this dispute. The class members do not appear to have a special interest in controlling the case, the court is unaware of any pending litigation that could not be transferred here, judicial economy supports concentrating the litigation in this court, and the suit presents no particular management problems.

The court therefore certifies the four § 11 plaintiff classes under Rule 23(b)(3), subject to the filing of the statement described above by each named plaintiff.

C. *The Misrepresentation Class*

The fifth proposed plaintiff class, the Misrepresentation Class, consists of all purchasers of publicly traded stock of Consumers from March 17, 1982 to November 9, 1983 who lost money on their investment. Plaintiffs seek certification of this class, once again, under Rule 23(a) and 23(b)(3).

The analysis begins with the prerequisites of Rule 23(a). Defendants do not contest the numerosity of the proposed Misrepresentation Class, and the court finds the group to be sufficiently numerous. Defendants do contest the other Rule 23(a) prerequisites, however. They attack the typicality and adequacy of the proposed

Misrepresentation Class representatives, Dr. Lubowitz and Mrs. Fineman. Defendants also argue that the group does not present common questions of law or fact, and that even if it did, these common questions do not predominate over individual issues as required by Rule 23(b)(3).

### 1. *Rule 23(a)(3) and (a)(4): Typicality and Adequacy*

■ Defendants first argue that Dr. Lubowitz presents a claim that is not typical of all class members, because he purchased Consumers stock both before and after substantial information was revealed to the public. Defendants reason that Dr. Lubowitz presents unique questions about his reliance on the alleged misstatements and omissions because he continued to purchase Consumers stock after a lot of bad news was known about the Midland plant. Therefore, his claim is atypical of the claims asserted by class members who purchased exclusively at the beginning of the class period.

The court disagrees. Dr. Lubowitz is an unusually typical representative because he purchased throughout the class period. He is in an ideal position to assert plaintiffs' primary claim, which charges defendants with a conspiracy to mislead investors that continued throughout the class period. It may become obvious during the court of discovery that defendants revealed material bad news about the Midland plant at a given point within the class period and that this disclosure undermines the fraud claims of later purchasers. If this happens, the Misrepresentation Class could be divided or its class period could be shortened. This is not a problem at this stage of the litigation, however.

■ Defendants make a similar objection the typicality of Mrs. Fineman. They contend that a lot of negative information about the Midland plant was available to the market by June 21, 1983, the date of Mrs. Fineman's purchase. Defendants conclude from this that Mrs. Fineman should not be allowed to represent those who purchased earlier than she did.

As with Dr. Lubowitz, the date of Mrs. Fineman's purchase is not a concern at this point. Plaintiffs allege a conspiracy to deceive purchasers throughout the entire Misrepresentation Class period, so it does not matter when Mrs. Fineman bought her stock. Moreover, late purchasers like Mrs. Fineman may be better class representatives than early purchasers would be. Late purchasers have a special incentive to prove the case of the earlier purchases, because this helps them establish defendants' liability in their own cases. While early purchasers can ignore events after their own purchases, later purchasers often need to prove early conduct as background, or to demonstrate a continuing conspiracy. *See Issen v. GSC Enter., Inc.*, 508 F.Supp. 1298, 1302 (N.D.Ill.1982) (early purchasers may lack the incentive to prove the claims of those purchasing after they did).

■ Defendants also object to Dr. Lubowitz and Mrs. Fineman because they are bringing § 11 claims as members of other proposed classes, in addition to the § 10(b) and Rule 10b–5 claim raised by the Misrepresentation Class. They point out that plaintiffs can secure damages under § 11 more easily than they can under Rule 10b–5, which requires proof of reliance and scienter. Defendants conclude from this that Dr. Lubowitz and Mrs. Fineman lack the necessary motivation to prove a Rule 10b–5 cause of action.

The courts which have considered the argument raised by defendants have rejected it, holding that a plaintiff may represent both a § 11 class as well as a fraud class. *See Wolfson v. Solomon*, 54 F.R.D. 584, 588–89 (S.D.N.Y.1972) (§ 11 plaintiff has motive to bring fraud claim because of greater potential recovery than might be available under § 11(e)); *In re Fin. Sec. Litig.*, 64 F.R.D. 443, 455 (S.D.Cal.1974) (quoting *Wolfson* and adopting its holding). The court finds these cases persuasive, and concludes that Dr. Lubowitz and Mrs. Fineman are typical and adequate class representatives.

### 2. *Rules 23(a)(2) and (b)(3): Common Questions of Law or Fact*

Defendants argue that the Misrepresentation Class presents no common questions, or that such questions certainly do not predominate over individual issues. They first attack Count VI of the complaint, which is the state law claim for fraud or deceit.[13]

#### a. *Fraud Claim Under State Law*

■ Defendants begin by reminding the court that reliance is an element of common law fraud. *See, e.g., Connellan v. Himelhoch,* 506 F.Supp. 1290, 1296 (E.D. Mich.1981) (quoting *Candler v. Heigho,* 208 Mich. 115, 121, 175 N.W. 141 (1919)). Plaintiffs must prove their individual reliance on defendants' misstatements or omissions in common law fraud actions, regardless of the status of the reliance requirement in § 10 suits alleging federal securities fraud. *See McFarland v. Memorex Corp.,* 96 F.R.D. 357, 364 (N.D.Cal. 1982). Defendants argue that the need for each plaintiff to prove reliance means that individual issues predominate over any common questions.

It appears that each Consumers investor presents an individual question of reliance, rather than one that is common to all class members, for three reasons. First, the investors themselves possess varying levels of sophistication, ranging from large institutions that carried out their own investigation of Consumers to individuals who picked Consumers by throwing a dart at the *Wall Street Journal.* Less sophisticated investors may be entitled to rely on statements that would not fool more sophisticated investors. Second, each plaintiff must show that the particular information available to him or her on the date of that individual's investment was false or misleading. Third, the substantive law applicable to various individuals may be very different, depending on where and when the purchases were made.

The court agrees with defendants and with those decisions that have refused to certify common law fraud claims that are joined with claims under § 10(b) and Rule 10b–5 in class action suits. *See McFarland, supra; Seiden v. Nicholson, supra.* Although some courts have reached the opposite conclusion,[14] this court concludes that common law fraud suits present individual questions that should not be addressed here. Accordingly, the court refuses to certify Count VI of the complaint for class treatment. That count will proceed only as a claim by the named plaintiffs, Dr. Lubowitz and Mrs. Fineman.

#### b. *Claims Under § 10(b) and Rule 10b–5*

Defendants contend that this court should refuse to certify the § 10(b) and Rule 10b–5 claim of the Misrepresentation Class. They assert two major arguments to support their contention that the federal fraud claim presents insufficient common questions. First, defendants argue that issues peculiar to each class member predominate because of the need to prove individual reliance. Second, defendants contend that individual issues predominate because the class period is so long, and because there are too many types of allegedly misleading documents involved.

■ Plaintiffs dispute defendants' first assertion that members of the Misrepresentation Class must each prove actual reliance on the alleged misstatements and omissions. Instead, plaintiffs urge this court to adopt the "fraud on the market" theory. Detailed and informative descriptions of the fraud on the market theory may be found in *Lipton v. Documation,* 734 F.2d 740, 743–48 (11th Cir.1984); *Blackie v. Barrack,* 524 F.2d 891, 906–08 (9th Cir.1975) *cert. denied,* 429 U.S. 816, 97 S.Ct. 57, 50 L.Ed.2d 75 (1976); and *In re LTV Sec. Litig.,* 88 F.R.D. 134, 142–46

---

**13.** Defendants also attack the Misrepresentation Class' assertion of Count VII of the complaint, but the court need not address this portion of defendants' argument. *See* note 9 *supra.*

**14.** *See, e.g., In re Victor Tech. Sec. Litig.,* 102 F.R.D. 53, 59–60 (N.D.Cal.1984); *Dekro v. Stern Bros. & Co.,* 540 F.Supp. 406, 418–19 (W.D.Mo. 1982).

(N.D.Tex.1980). Briefly, the theory finds that plaintiffs need not prove direct reliance in class action suits alleging that deception inflated open market stock prices. Instead, a court should rebuttably presume that the plaintiffs relied on the integrity of the market to set a fair price for the stock. Defendants can disprove reliance by showing that that deception was immaterial, that the stock price was not inflated, or that plaintiffs did not in fact rely on the integrity of the market. Recent authority has overwhelmingly endorsed the fraud on the market theory. *See Lipton, supra,* at 743 (citing cases).

This court believes that the fraud on the market theory is predicated on sound economic principles, and that it applies to the allegations made in this case. It is important to emphasize, however, that the theory works here because plaintiffs have alleged a conspiracy to inflate stock values that runs throughout the class period. If no conspiracy was alleged, plaintiffs would have to demonstrate the wrong committed by each defendant, the time that the wrong occurred, and the market distortion caused by the particular wrong. In this situation, all plaintiffs would not necessarily have relied on the same market fraud, so individual questions could predominate.

The fraud on the market theory does apply, however, to the case alleged by plaintiffs. Therefore, plaintiffs need not prove actual reliance as a part of their *prima facie* case. Individual issues do not predominate over common legal and factual questions for this reason.

Defendants' second argument is that the length of the class period and the wide array of disclosure materials that are challenged mean that common issues do not predominate. They cite cases where courts have rejected proposed securities classes challenging large numbers of documents, released over an extended period of time, that allegedly contained misstatements differing substantially from one document to another. The courts found that the factual issues raised in these cases were too divisive to warrant class treatment. *See, e.g.,*

*Polin v. Conductron Corp.,* 552 F.2d 797, 802–03 (8th Cir.1977), *cert. denied,* 434 U.S. 857, 98 S.Ct. 178, 54 L.Ed.2d 129 (1977); *Zandman v. Joseph,* 102 F.R.D. 924, 928–29 (N.D.Ind.1984).

The cases cited by defendants are distinguishable from the present case, where plaintiffs allege that defendants released a series of similar misstatements and omissions over the class period. In cases such as this, courts have found that a common question was presented:

> The overwhelming weight of authority holds that repeated misrepresentations of the sort alleged here satisfy the "common question" requirement. Confronted with a class of purchasers allegedly defrauded over a period of time by similar misrepresentations, courts have taken the common sense approach that the class is united by a common interest in determining whether a defendant's course of conduct is in its broad outlines actionable, which is not defeated by slight differences in class members' positions, and that the issue may profitably be tried in one suit.

*Blackie v. Barrack, supra,* at 902 (citations omitted). *See also Piel v. National Semiconductor Corp.,* 86 F.R.D. 357, 368 (E.D.Pa.1980) (finding a common question where "plaintiff has alleged that the defendants' conduct constituted a common nucleus of operative facts or a single, unitary scheme"); *Herm v. Stafford,* 461 F.Supp. 508, 514 (W.D.Ky.1978) ("While different members of the class may have relied on different reports and statements, repeated [common and interrelated] misrepresentations as alleged herein satisfy the 'common question' requirement.").

The court therefore concludes that the Misrepresentation Class based on the federal claims presents common questions of law and fact that predominate over individual issues. The Misrepresentation Class therefore satisfies all of the requirements of Rule 23(a), as well as the predominance requirement of Rule 23(b)(3). This leaves the question of whether a class action is superior to alternative methods for adjudi-

cating these claims. The court believes that the foregoing discussion makes the answer to this question clear. The common claims of the Misrepresentation Class should be tried together to conserve judicial resources, and allow vindication of small wrongs. The court sees no particular prejudice to the group of plaintiffs or management problems from using the class action device. Therefore, the court grants plaintiffs' motion to certify the § 10(b) and Rule 10b–5 claims of the Misrepresentation Class. Dr. Lubowitz and Mrs. Fineman may represent the Class, provided they submit the written statement discussed earlier.

## IV. MOTION TO CERTIFY THE THREE DEFENDANT CLASSES

Plaintiffs also move for the certification of three classes of defendant underwriters. The proposed classes consist of (1) the 121 underwriters that participated in the February 17, 1983 public offering of 5,000,000 shares of Consumers common stock; (2) the 118 underwriters that participated in the June 21, 1983 public offering of 5,000,-000 shares of Consumers common stock; and (3) the 83 underwriters that participated in the October 13, 1983 public offering of 2,000,000 shares of Consumers common stock. Plaintiffs designate Morgan as the representative of each defendant class. Morgan, as lead underwriter for the three offerings, formed, managed, and represented the three underwriting syndicates.

■ Once again, plaintiffs move to certify these classes under Rules 23(a) and 23(b)(3). If plaintiffs fulfill the requirements of Rule 23, a court may certify defendant as well as plaintiff classes. *See, e.g., Northwestern Nat'l Bank of Minneapolis v. Fox & Co.,* 102 F.R.D. 507, 510 (S.D.N.Y.1984), ("there is no question but that the [defendant class action] procedure is available where all of the requirements of Rule 23 are met"); *Thillens, Inc. v. Community Currency Exch. Ass'n of Illinois,* 97 F.R.D. 668, 673 (N.D.Ill.1983) ("Rule 23 of the Federal Rules of Civil Procedure clearly contemplates both plain-

tiff *and* defendant class actions.") (emphasis in original).

### A. *Rule 23(a)(1): Numerosity*

■ The February, June, and October, 1983 defendant underwriter syndicates are composed of 121, 118, and 83 members respectively, many of whom overlap. "Where the number of class members exceeds forty, and particularly where class members number in excess of one hundred, the numerosity requirement will generally be found to be met." *In re Itel Sec. Litig.,* 89 F.R.D. 104, 111–12 (N.D.Cal.1981) (citing 3B Moore's Federal Practice ¶ 23.05[1] (2d ed. 1948)). However, courts do not rely solely on the actual number of proposed class members in determining the impracticability of joinder. Instead, they base their determination of the particular circumstances of the case. *See Senter v. General Motors Corp.,* 532 F.2d 511, 523, n. 24 (6th Cir.1976), *cert. denied,* 429 U.S. 870, 97 S.Ct. 182, 50 L.Ed.2d 150 (1976).

■ A class is sufficiently numerous when joinder is not a reasonable alternative to class adjudication. This occurs when "the number of parties to be joined reaches the point of eliminating individual influence over pleading, discovery and litigation strategy". *In re Gap Stores Sec. Litig.,* 79 F.R.D. 283, 302 (N.D.Cal.1978) (finding a group of 91 defendant underwriters sufficiently numerous). The *Gap Stores* court observed that the only way it "could join ninety-one new parties would be to require that the litigation be conducted through committees, that is, to make joinder a fiction for class adjudication." *Id.*

■ Another factor to consider is the burden that joinder would impose in a case. The court in *Itel, supra,* found defendant underwriter classes of 104 and 114 members to be sufficiently numerous for class certification, in part because:

Joinder would necessitate individual representation which would be financially burdensome to the underwriter defendants and burdensome to the Court in the trial of the action. Joinder would pose a further financial burden on all parties to

the action by requiring the preparation and service on each of the underwriter defendants a copy of every paper filed in the case. 89 F.R.D. at 112.

 Morgan argues that joinder is not impracticable, because all of the defendant underwriters are easy to identify, locate, and serve. However, "the fact that all class members in the present action are known and could be joined in the action is not determinative." *Itel, supra.* Plaintiffs' ability to identify and locate the members of the defendant classes does not solve the problems that joinder presents in this case. The proposed classes remain too large for each defendant to control the litigation, and joinder would tax the resources of this court and of the parties themselves. The court finds that the three proposed defendant classes are sufficiently numerous.

## B. *Rule 23(a)(2): Common Questions*

 Plaintiffs' sole claim against each defendant underwriting syndicate is that its respective prospectus violates § 11 by containing material misrepresentations and omissions. A number of common legal and factual questions flow from this claim. For example, all plaintiffs must prove that their prospectuses included material misrepresentations and omissions, and that these defects caused plaintiffs' damage. Another common question is whether Morgan as lead underwriter conducted a proper due diligence review of the assertions made in the offering materials on behalf of each member of the underwriting syndicates. These questions more than satisfy Rule 23(a)(2), which requires only a single issue common to all class members. *See Thillens, supra,* at 677.

## C. *Rule 23(a)(3): Typicality*

Morgan is almost certain to present three defenses that are typical of all of the other defendant underwriters. Specifically, Morgan will argue that the offering materials were not false and misleading, that Morgan as lead underwriter acted with due dil-

igence on behalf of itself and the syndicate members, and that plaintiffs purchased their stock knowing of any untruths or omissions. The District Court for the Northern District of California has twice concluded that these shared defenses satisfy the typicality requirement of Rule 23(a)(3). *See Itel, supra,* at 112–13; *Gap Stores, supra,* at 302–03.

Morgan argues that it will present its own "due diligence defense" that will be typical only of Morgan. The due diligence defense is found in § 11(b)(3) of the 1933 Act, 15 U.S.C. § 77k(b)(3). That section provides that an underwriter will not be liable if "he had, after reasonable investigation, reasonable ground to believe and did believe" that the registration statement did not omit or misrepresent material facts.

 The lead underwriter is usually the only underwriting syndicate member to investigate the issuer to verify the contents of the offering materials. *See, e.g.,* R. Jennings & H. Marsh, Jr., *Securities Regulation* 755–56 (5th ed. 1982). After the investigation, the lead underwriter shares its acquired knowledge with the other underwriters in a "due diligence meeting." Although the syndicate members usually delegate to the lead underwriter their responsibility to insure the accuracy of the offering materials, all underwriters are held to the same high standard of diligence. *See Escott v. BarChris Const. Corp.,* 283 F.Supp. 643 (S.D.N.Y.1968). The underwriting syndicate members therefore sink or swim with the lead underwriter in the usual case. This suggests that the lead underwriter can be expected to present a typical defense.

Morgan argues that each member of the underwriting syndicates may have conducted its own due diligence investigation of Consumers. If so, then the due diligence defense of each underwriter could be separate and distinct from that of Morgan. In the absence of evidence about whether any independent investigations occurred, Morgan argues that the court should not presume typicality. *See General Tel. Co. of the Southwest v. Falcon,* 457 U.S. 147, 160,

102 S.Ct. 2364, 2372, 72 L.Ed.2d 740 (1982) ("[A]ctual, not presumed, conformance with Rule 23(a) remains, however, indispensable.").

■ It appears to the court that Morgan will assert a number of important defenses that are typical of all underwriters, even if some members did investigate on their own.[15] The existence of individual due diligence defenses therefore should not defeat class certification. Syndicate members who have other defenses may make suggestions to the court on how these defenses should be presented.[16] The court concludes that Morgan satisfies the typicality requirement.

### D. Rule 23(a)(4): Fair and Adequate Representation

■ Courts must examine the adequacy of the proposed class representative with particular care in defendant class action suits. See, e.g., In re Arthur Treacher's Franchise Litig., 93 F.R.D. 590, 597 (E.D. Pa.1982) (citing cases). As Professor Chaffee had observed:

> It is a strange situation where one side picks out the generals for the enemy's army. When A is suing a class, he naturally wants the class to lose. At best, he is not fit to make a disinterested and well-informed selection among his opponents. At worst, he has strong motives for choosing straw men and incompetents, who will lie down before his projected attack.

Z. Chaffee, supra, at 237–38. As a result of these concerns, "[t]he judge ought to regard the unnamed members of the sued class as wards of the court for the time being, and assume the same sort of responsibility for making sure that their interests are properly safeguarded as when he chooses a receiver or a trustee in bankruptcy." Id. at 238.

■ One area for the court to examine is the ability of the proposed representative to bear the burdens of defending the class. "It is presumed that representatives will vigorously prosecute or defend the action if they have retained well qualified counsel and if they possess sufficient resources or stake in the outcome of the case to bear the financial burden of litigation." Gap Stores, supra, at 303. See also Thillens, supra, at 679 ("The real concern with a reluctant [defendant class] representative should be for his ability to carry the expense and other practical burdens of a class defense.").

A number of factors suggest that Morgan is ideally positioned to bear the burdens of class representation. It has retained well qualified counsel who have demonstrated a high level of ability to defend this case. In addition, Morgan will vigorously defend the class to protect its own reputation, especially since Morgan occupied the highly visible position of lead underwriter. Finally, Morgan has sufficient financial resources to serve as class representative. Not only can it draw on its own resources, but each syndicate member is contractually bound to pay its pro rata share of any expenses incurred by Morgan in defending this action.[17]

---

**15.** Plaintiffs argue that it is extremely unlikely that any syndicate member will claim to have conducted an investigation equal or superior to that of Morgan. They rely on general industry practice, and on the Master Agreements Among Underwriters that covered the stock issues in question. Section 9.1 of these Agreements indicates that Morgan took primary responsibility for the content of the offering materials. It authorizes Morgan to approve amendments or supplements to these documents on behalf of the syndicate members, and tells the members of their responsibility to familiarize themselves with the documents.

**16.** See also Part IV.D. infra. If the syndicate members want to defend themselves as a group separately from Morgan, they can select their own representative and Morgan will defend only itself.

**17.** The Master Agreements Among Underwriters for each of the stock issues in question contain this provision. Each syndicate member has agreed to pay its underwriting percentage of "all expenses incurred by the manager in investigating or defending against any claim or proceeding" relating to the registration statement or prospectus. The District Court for the Northern District of California has found the existence of a similar agreement to support a finding that

 Morgan argues that it will be an inadequate class representative because conflicts of interest may arise between it and the rest of the underwriters. It cites § 11(f) of the 1933 Act, 15 U.S.C. § 77k(f), which would allow the participating underwriters to escape contribution for Morgan's § 11 liability by showing fraudulent misrepresentation by Morgan. The syndicate members would therefore benefit from evidence of Morgan's fraud on them. However, Morgan would lack any incentive as class representative to investigate evidence of its own fraudulent misrepresentations, and might even settle the case quickly to conceal such information.

The court recognizes the possibility that conflicts may arise between Morgan and the other underwriters. At the same time, Morgan is an ideal representative for the three defendant classes in many other respects.

The court therefore will deem Morgan a fair and adequate defendant class representative only on a provisional basis. Morgan will allow the participating underwriters an opportunity to select a single other party who can better represent them, if they so desire.[18] The underwriting syndicate members thus will decide if Morgan is adequate to represent them.

### E. Rule 23(b): Predominance of Common Questions & Superiority

 It is clear that common questions predominate over questions peculiar to the defendant classes. All of the members of each class must defend themselves against the same theory of liability and factual assertions. All will invoke the same defenses, with two exceptions that may never arise in the litigation.[19] Even damages can

be treated as a class issue, to an extent. All of the underwriters will want to prove that the decline in the value of Consumers stock was unrelated to the contents of the offering materials, and all are jointly and severally liable to the plaintiffs.[20] See Itel, supra, at 114.

 Not only do common questions predominate, but the class action device is superior to other available methods for resolving this controversy. The court adopts the reasoning of the District Court for the Northern District of California on the superiority issue:

The participating underwriters lose control over the litigation but they gain the enormous economies of a group defense. The unconscionable expense of filing and serving ninety-one individuals by identical answers is avoided. Also avoided is the cost of discovery relevant to each participant's due diligence, unless and until the manager's liability has been determined. On the other hand, class members have an opportunity to monitor the litigation and to raise a voice in its settlement which sweetens the bitter pill of contribution.

Significant judicial economies are achieved by one rather than ninety-one determinations of such common questions as whether the registration statement contained a material misrepresentation, even though this court may be faced with ninety-one separate determinations of participant due diligence. Only the facts will show how time consuming and manageable these individual determinations will be, however, it is plausible to surmise that a majority of the participants performed their statutory duties in exactly the same way, as for example, by

the lead underwriter is an adequate representative of the syndicate members. See Itel, supra, at 113.

18. The procedure to be followed is described in Part IV.F. infra.

19. The possible exceptions are the due diligence of the individual underwriters and fraudulent misrepresentations by Morgan to the other underwriters. See Parts IV.C. and IV.D. supra.

20. Each underwriter is jointly and severally liable under § 11, up to the total monetary value of the securities underwritten and sold by that individual. See §§ 11(e) and (f), 15 U.S.C. § 77k(e) and (f). In addition, each must pay a share of any legal expenses incurred by Morgan in defending this suit. See note 17 supra and accompanying text.

attending a "due diligence meeting" called by the managers. Such a common course of conduct will simplify trial, but it will not eliminate the right of each participant to assert his individual defense before the trier of fact.

*Gap Stores, supra,* at 305 (citation and footnote omitted).

The court therefore concludes that the three proposed classes of defendant underwriters satisfies the requirements of Rule 23(b)(3).

### F. *Conclusion*

The three groups of underwriters satisfy the requirements of Rule 23, and this case will proceed as a defendant class action lawsuit as well as a plaintiff class action lawsuit. The court designates Morgan as the provisional representative of the three defendant classes, and directs Morgan to convene a meeting or meetings of all members of the three underwriting syndicates within thirty (30) days of the date of this memorandum opinion and order. At the meeting(s), Morgan should inform the underwriters of its provisional representation, and allow them to decide whether a single other party should be selected. Morgan shall report the results of the meeting(s) to the court within forty (40) days of the date of this memorandum opinion and order. To the extent that the underwriters select another representative for a defendant class or classes, Morgan will remain in this case as an individual defendant. Otherwise, Morgan will serve as the representative of the underwriter defendants.

SO ORDERED.