**In the Matter of DeLOREAN MOTOR COMPANY, a Michigan corporation, Debtor.**

**David W. ALLARD, Jr., Trustee in Bankruptcy, Plaintiff,**

**v.**

**Edward L. SMITH, et al., Defendant, Third-party Plaintiff,**

**v.**

**ARTHUR ANDERSEN & CO. (U.S.A.) Arthur Andersen & Co. (Republic of Ireland) and Arthur Andersen & Co. (United Kingdom), Third-party Defendants.**

**Bankruptcy No. 82–06031–G.
Adv. No. 84–1032.**

United States Bankruptcy Court,
E.D. Michigan, S.D.

Jan. 22, 1986.

Irwin Alterman, Richard Bisio, Hyman, Gurwin, Nachman, Friedman & Winkelman, Southfield, Mich., for third-party plaintiff Henry Bushkin.

Joseph F. Galvin, Schlussel, Lifton, Simon, Rands, Kaufman, Galvin & Jackier, Southfield, Mich., for third-party plaintiff Edward L. Smith.

James D. Zirin, James J. Sabella, New York City, for third-party defendant Arthur Andersen & Co.; Richard J. Schechter, Breed, Abbott & Morgan, of counsel.

ORDER DENYING MOTIONS TO DISMISS THIRD PARTY COMPLAINTS AGAINST ARTHUR ANDERSEN & CO.

RAY REYNOLDS GRAVES, Bankruptcy Judge.

The Court is presented with two motions filed by Arthur Andersen & Co. (Andersen) pursuant to Federal Rule of Civil Procedure 12(b)(6) to dismiss third-party complaints filed by Edward L. Smith and Henry I. Bushkin. Andersen contends, *inter alia*, that the complaints fail to allege and establish that the third-party plaintiffs are in privity of contract with Andersen and have therefore failed to state a claim upon which relief may be granted. Oral arguments were heard on September 19, 1985. For reasons set forth below the motions to dismiss as to each count of the complaints are DENIED.

Smith and Bushkin were members of the DeLorean Motor Company's (DMC) Board of Directors who had contracted with Andersen to provide accounting services for the years 1976 through December 1982. Each year the audit reports were given to the Board of Directors. Subsequent to DMC filing a Chapter 11 petition in bankruptcy on October 25, 1982 and its later conversion to Chapter 7, Smith and Bushkin were named by the Trustee to be among 22 defendants in an adversary proceeding seeking damages and property of the estate in excess of $100 million. Many of the defendants filed motions to dismiss which, as fully set forth in this Court's June 3, 1985 Memorandum and Order, *In re DeLorean*, 49 B.R. 900 (Bkrtcy.E.D. Mich.1985), were denied.

Prior to the June 3 Order, on April 23, 1985, Smith filed a five count third-party complaint against Andersen alleging malpractice, negligence and fraudulent concealment, breach of contract, breach of warranty, and common law fraud. Court I asserts Andersen knew, should have known, or should have reasonably foreseen that members of the Board of Directors of DMC, including Smith, would rely on Andersen's reports, as permitted by Mich.

Comp.Laws Ann. § 450.1541 to comply with the standards of care established by members of the accounting profession and rely on Andersen to adequately audit DMC and report findings to the Board of Directors; that Andersen breached its duty to comply with the standard of care thus enabling John Z. DeLorean (DeLorean) to conceal from the Board of Directors, and Smith, Delorean's alleged involvement in various transactions at issue in the Trustee's adversary proceeding. Count II maintains Andersen further breached its duty by failing to discover and report the embezzlement of DMC funds by DeLorean by issuing false and misleading financial statements and by failing to maintain DMC's financial records in accordance with generally accepted accounting procedures (GAAP); and that Andersen knew, should have known or should have reasonably foreseen that Smith, as a member of the Board of Directors, would rely on Andersen's performance of its duties owed to DMC. Count III alleges Smith as a member of the Board of Directors was one of the intended beneficiaries of the contract of an engagement between Arthur Andersen and the DMC; and that accurate and competent performance of the contracts was necessary to enable Smith to carry out his duties as a member of the Board of Directors. Count IV alleges Andersen certified financial statements on behalf of DMC for fiscal year 1978, 1979, 1980, and 1981; that the certification constituted a warranty to Smith and the Board of Directors that the financial statements were prepared in accordance with generally accepted accounting standards (GAAS), in due diligence; and that Andersen breached its duty of warranty resulting in various injuries to Smith and the corporation. Count V alleges Andersen fraudulently misrepresented in its opinions certifying the financial statements of DMC; that those financial statements had been prepared in accordance with GAAS; that Andersen represent-

ed that it had adequately investigated the financial records and transactions of DMC when it knew that its investigations into DMC's financial affairs were superficial and inadequate; that upon Andersen's learning the material facts surrounding various transactions consummated by DeLorean, it withheld the facts from the Board of Directors; that as a result, members of the Board of Directors, including Smith were given a false impression of DMC's finances and financial transactions; that Andersen failed to revise the financial statements upon learning of the material facts which have made the financial statements materially false and misleading; and that Smith in good faith relied upon the representations of Andersen and was injured thereby.

The third-party complaint filed by Bushkin asserts a right of contribution against 20 defendants.[1] In addition to alleging in Count I a right to contribution, Bushkin alleges many of the claims asserted by Smith as a duty owed by Andersen to the Board of Directors. Count II however, more narrowly tailors the duty owed by Andersen to the individual members of the Board of Directors by extending the duty to individual members of the audit committee. Bushkin asserts that he, as a director and member of the audit committee, relied upon Andersen to perform consistent with its duty; that to the extent that the trustee's action against Andersen, *Allard v. Arthur Andersen & Co.,* 84–CIV.7703 (C.E. S.), (U.S.D.C.N.Y.), for breach of duty and malpractice is successful, Bushkin would be damaged to the extent of any judgment entered against him in the Trustee's case against Bushkin. Count III asserts a contractual duty existed between Andersen and the Board of Directors or the audit committee. Count IV alleges that Bushkin is a contracting party with Andersen by means of his membership on the Board of

1. Named in the third-party complaint filed by Bushkin are Arthur Andersen & Co. (U.S.A.), Arthur Andersen & Co. (Republic of Ireland), Arthur Andersen & Co. (United Kingdom), John Z. DeLorean, G. Edmund King, Alex H. Fetherston, James Sim, Eugene A. Cafiero, C. Richard Brown, T. Joseph Daly, C.S. Harte, M.J. Styliandies, Donald H. Lander, William F. Haddad, G.J. Hayward, and Walter P. Strycker, Charles K. Bennington, Anthony S. Hopkins, William T. Collins and Robert M. Dewey.

Directors or the audit committee or, alternatively, that Andersen's engagement was intended for the benefit of the individual directors or the individual members of the audit committee, and that Bushkin is a party to, or a third-party beneficiary of, Andersen's engagement contract. Count V asserts that a fiduciary relationship existed between Andersen and Bushkin and that to the extent Andersen breached a duty to the corporation, he also breached a duty to Bushkin individually.

Andersen's motion to dismiss is premised on the doctrine of privity as delineated in *Ultramares v. Touche*, 255 N.Y. 170, 174 N.E. 441 (1931). In *Ultramares* the accountant had prepared certified audit reports for its client, a corporation, with knowledge that the reports would be exhibited to banks, creditors, shareholders, purchasers and sellers, according to the needs of the corporation as the basis of its financial dealings. In dismissing the negligent misrepresentation action, the Court noted the absence of communication between the plaintiff and the accountant. Absent any communication between the parties, the Court viewed the plaintiff as one of many possible corporations and business entities to be approached by the corporation for funding its operation.

After finding plaintiff to be among an indeterminable and unforeseeable class of potential plaintiffs, Judge Cardozo wrote, in defense of the citadel of privity, of the perils that would befall accountants and other professionals should liability be extended to such a vast group of potential plaintiffs.

> If liability for negligence exists, a thoughtless slip or blunder, the failure to detect a theft or forgery beneath the cover of deceptive entries, may expose accountants to a liability in an indeterminate amount for an indeterminate time to an indeterminate class. The hazards of a business conducted on these terms are so extreme as to enkindle doubt whether a flaw may not exist in the

implication of a duty that exposes to these consequences.

*Ultramares*, 174 N.E. at 444.

In so finding, Judge Cardozo had little difficulty in distinguishing *Ultramares* from *Glanzer v. Shepard*, 233 N.Y. 236, 135 N.E. 275 (1922), which he had authored just seven years earlier. He noted that in *Glanzer* the seller of beans requested the defendant, a public weigher, to weigh the beans and to provide the buyer and seller a copy of the weight and to afford an additional copy to the city. The buyer relied on the certified weight and paid the seller the amount shown. Judge Cardozo found that in contrast to the facts presented in *Ultramares*:

> Here was a case where the transmission of the certificate to another was not merely one possibility among many, but the end and aim of the transaction ... the [bond between the parties] was so close as to approach that of privity, if not completely one with it ... in a word, the service rendered by the defendant in *Glanzer v. Shepard* was primarily for the information of a third person in effect, if not in name, a party to the contract and only incidentally for that of the formal promisee.

*Ultramares*, 174 N.E. at 445–446.

The years following *Ultramares* have seen the attack on the doctrine of privity continue at a pace Judge Cardozo would find feverous and unsettling. Numerous courts have relaxed or done away with the doctrine. *Merit Insurance Company v. Colao*, 603 F.2d 654 (7th Cir.1979); *Rhode Island Hospital Trust National Bank v. Swartz, Bresenoff, Yavner & Jacobs*, 455 F.2d 847 (4th Cir.1972); *Seedkem, Inc. v. Safranek*, 466 F.Supp. 340 (D.Neb.1979); *Coleco Industries, Inc. v. Berman*, 423 F.Supp. 275 (E.D.Pa.1976), *aff'd* in part, 567 F.2d 569 (3rd Cir.1977); *Rusch Factors, Inc. v. Levin*, 284 F.Supp. 85 (D.R. I.1968); *Ryan v. Kanne*, 170 N.W.2d 395 (Iowa 1969); *Haddon View Investment Co. v. Coopers & Lybrand*, 70 Ohio State 2d 154, 436 N.E.2d 212 (1982); *Rosenbloom, Inc. v. Adler*, 93 N.J. 324, 461 A.2d 138 (1983); *Citizens State Bank v. Timm, Schmidt & Co.*, 113 Wis.2d 376, 335 N.W.2d 361 (1983).[2]

---

**2.** See also: Gromley, *The Foreseen, The Foresee-* *able and Beyond—Accountants' Liability to Non-*

Nowhere has the battle been waged with greater intensity than in the Courts of New York since 1977. After years of steadfastly adhering to *Ultramares,* the New York Court of Appeals in *White v. Guarante,* 43 N.Y.2d 356, 401 N.Y.S.2d 474, 372 N.E.2d 315 (1977), appeared to set a new course on the issue of accountant liability. Limited partners were allowed to recover from accountants who had been retained to perform an audit for the tax returns of the partnership. The court, relying on Judge Cardozo's distinction of *Glanzer* from *Ultramares* and *Hochfelder v. Ernst & Ernst,* 503 F.2d 1100 (7th Cir.1974), *Rev'd.* on other grounds, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976), found the accountant:

> [W]as retained to perform an audit and prepare the tax returns of the partnership. The accountant must have been aware that a limited partner would necessarily rely on or use the audit and tax returns of the partership, or at least constituents of them, in order to properly prepare his or her own tax returns. This was within the contemplation of the parties to the accounting retainer. In such

circumstances, assumption of the task of auditing and preparing the tax returns was the assumption of a duty to audit and prepare carefully for the benefit of those in the fixed, definable and contemplated group whose conduct was to be governed, since, given the contract and the relation, the duty is imposed by law and it is not necessary to state the duty in terms of contract or privity.

*White,* 401 N.Y.S.2d at 477–478, 372 N.E.2d at 318–319.

Though argued as a broad exception to the rule of *Ultramares,* (*Aeronca, Inc. v. Gorin,* 561 F.Supp. 370, 377 (S.D.N.Y. 1983),[3]) *White* is generally viewed as a narrow exception to the *Ultramares* rule and among several New York Court of Appeals decisions placing the issue of accountant liability in "disarray" within recent years.[4] *Id.* Order has recently been restored by *Credit Alliance v. Arthur Andersen & Co.,* (*European American Bank v. Strauhs & Kaye*), 65 N.Y.2d 536, 493 N.Y.S.2d 435, 483 N.E.2d 110 (1985); 101 App. Div.2d 231, 476 N.Y.S.2d 539 (1984).

*Credit Alliance* addressed two factually distinguishable[5] appeals sharing the issue

*clients,* 14 Seton Hall Law Review 528 (1984); Besser, *Privity?—An Obsolete Approach to the Liability of Accountants to Third-parties,* 7 Steton Hall Law Review 507 (1976); Fiflis, *Current Problems of Accountants' Responsibilities to Third-parties,* Vanderbilt Law Review, 31 (1975); Levitin, *Accountants' Scope of Liability for Defective Financial Reports,* 15 Hastings Law Journal 436 (1964).

**3.** In arguing that *White* represents an expanded view of the *Ultramares* rule, plaintiff in *Aeronca* relied heavily on *Credit Alliance v. Arthur Andersen & Co.,* 101 App.Div.2d 231, 476 N.Y.S.2d 539 (1984). The view was rejected because (1) the district court was not bound by *White's* interpretation of *Ultramares;* (2) statements in *Credit Alliance* that plaintiff had a cause of action against the accounting firm for negligence were deemed by the district court to be dicta; and (3) the court believed the *Credit Alliance* decision read *White* too broadly. *Aeronca, Inc.,* 561 F.Supp at 377 Note 18.

**4.** The court in *Lumbard v. Maglia, Inc.,* (D.C.N. Y.1985), 621 F.Supp. 1529, found the law on that subject (accountant liability) was in disarray. See also, *In re AM International, Inc. Securities Litigation,* 606 F.Supp. 600, 611 (D.S.D.N.Y.

1985) ("Since this court has been afforded no basis to conclude that the Court of Appeals is prepared to further relax the privity requirements ... the court is constrained to apply the law as it presently stands ... should the Court of Appeals rule otherwise in *European American Bank* or *Credit Alliance,* as to which leave to appeal has been granted, the court will reinstate the negligence claim.") *Mallis v. Bankers Trust Company,* 615 F.2d 68, 83 (2nd Cir.1980) "given the language of the few recent New York cases that have dealt with this issue, we predict that New York courts when directly confronted with the issue, would hold the Restatement [of torts] requirement" of duty between parties supports and action for negligent misrepresentation. The court makes its prediction based upon its view that in 1980 the "general rule that applies in the majority of American jurisdictions at the present [1980] is that the critical factor in the relationship between the parties is their reasonable expectations, not their formal legal relationship which is reflected in the Restatement (2nd of Torts, § 552) (1977).

**5.** *Credit Alliance* was a consolidated order on the appeals of *Credit Alliance v. Arthur Andersen & Co.,* 101 App.Div.2d 231, 476 N.Y.S.2d 539 (1984) and *European American Bank v. Strauhs & Kaye,* whose appellate decision is unreported.

of "whether an accountant may be held liable, absent privity of contract, to a party who relies to his detriment on a negligently prepared financial report and, if so, within what limits does the liability extend." *Id.*, 493 N.Y.S.2d at 436, 483 N.E.2d at 111. In *Credit Alliance* plaintiff provided financing to a capital intensive enterprise that regularly required financing. In 1978 as a condition for additional financing, plaintiff insisted on examining an audited financial statement. Plaintiff was later given a copy of a certified audit report prepared by the accountant for the corporation upon which he later advanced further financing. In *European American Bank, supra,* substantial loans were made to a corporation and its subsidiaries. Later the corporation retained an accounting partnership to audit its financial records. European American Bank relied upon the interim and year end financial reports prepared by the accountants to determine the amount to be loaned the corporation.

Having examined at length the *Glanzer, Ultramares* and *White* cases, the court reaffirmed the principles articulated in each of the cases and announced a three part "flexible criteria" test in the application of the privity doctrine to accountant's liability.

Before accountants may be held liable in negligence to noncontractual parties who rely to their detriment on inaccurate financial reports, certain prerequisites must be satisfied:

1. The accountants must have been aware that the financial reports were to be used for a particular purpose or purposes;

2. In the furtherance of which a known party or parties was intended to rely; and

3. There must have been some conduct on the part of the accountant linking them to that party or parties, which event is the accountant's understanding of that party or parties reliance.

*Credit Alliance,* 493 N.Y.S.2d at 443, 483 N.E.2d at 118.[6]

Applying the three part test, the court reversed the lower appellate court in *Credit Alliance* and dismissed the appeal. The court found the facts presented failed to demonstrate the existence of a relationship between the parties sufficiently approximating privity. *Id.*, 493 N.Y.S.2d at 444, 483 N.E.2d at 119. There was no adequate allegation of either a particular purpose for the report's preparation or the prerequisite conduct on the part of the accountant. *Id.*, 493 N.Y.S.2d at 444, 483 N.E.2d at 119.[7] In *European American,* however, the court found the "primary, if not exclusive, end and aim" of preparing an audit report was to provide the corporation with the information it required. In addition to alleging the accountants knew the identification of the nonprivity party, the "complaint and affidavit alleged the accountant's awareness of the particular purpose of their services and certain conduct creating an unmistakable relationship with the reliant plaintiff." *Id.* Thus, the court concluded, "[i]t cannot be gainsaid that the relationship there created between the parties was the practical equivalent of privity. The parties' direct communications and personal meetings resulted in a nexis between them sufficiently approaching privity under the principles of *Ultramares, Glanzer* and *White* to permit the cause of action." *Id.*, 493 N.Y.S.2d at 445, 483 N.E.2d at 120.

Andersen contends the rule in *Ultramares* as reformulated in *Credit Alli-*

---

6. The court added that "while these criteria permit some flexibility in the application of the doctrine of privity to accountant liability, they do not represent a departure from the principle's articulated in *Ultramares, Glanzer* and *White,* but rather, they are intended to preserve the wisdom and policies set forth therein." *Credit Alliance,* 493 N.Y.S.2d at 443, 483 N.E.2d at 118.

7. The court noted that while the allegations state that the plaintiff was induced to extending credit, no claim was made that the accountant was being "employed to prepare the report with that particular purpose in mind, or that they had agreed to send plaintiff a copy of the report." *Credit Alliance,* 493 N.Y.S.2d at 444, 483 N.E.2d at 119.

*ance* holds that accountants owe no duty to and cannot be liable to members of unforeseeable classes of potential plaintiffs. Andersen contends further that Smith and Bushkin, as members of the Board of Directors of DMC, are members of an unforeseeable class of plaintiffs. We agree with Andersen that by reaffirming the principles of *Ultramares, Credit Alliance* precludes recovery by unforeseen plaintiffs against accountants. But recent decisions clearly demonstrate that *Credit Alliance* imposes liability upon accountants to foreseeable plaintiffs who have relied on the representations of the accountant.

In its companion case, *Strauss v. Belle Realty Company,* 65 N.Y.2d 399, 492 N.Y.S.2d 555, 482 N.E.2d 34, the New York Court of Appeals stated:

> In another context, where this court has defined the duty of a public accounting firm for negligent financial statements, we have recognized that the duty runs both to those in contractual privity with the accountant and to those whose bond is so close as to be, in practical effect, indistinguishable from privity, and we have on a public policy grounds precluded wider liability to persons damaged by the accountant's negligence.

*Strauss,* 492 N.Y.S.2d at 558 n. 2, 482 N.E.2d at 37–38 n. 2.

■ Cases subsequent to *Credit Alliance* have dismissed complaints against accountants for failure to demonstrate the existence of a relationship between the parties sufficiently approaching privity. In *Westpac Banking Corporation v. Deschamps,* (N.Y.App.1985), 66 N.Y.2d 16, 18, 494 N.Y.S.2d 848, 849, 484 N.E.2d 1351, 1352, the court dismissed a complaint filed against accountants for failing to show "the identity of the specific nonprivity party who would be relying upon the audit reports." See also, *Lumbard v. Maglia, Inc.,* (D.C.N.Y.1985), 621 F.Supp 1529, 1532 (In order to survive a motion to dismiss, the complaint or accompanying affidavits must contain some allegation "to demonstrate the existence of a relationship between the parties sufficiently approaching privity."); *Texwood Ltd. v. Gerber,* (D.C.S.D.N.Y. 1985), 621 F.Supp. 585, 588 (Complaint dis-

missed because plaintiff did not plead the "conduct on the part of the accountant linking them to the relying party which evidences the accountant's understanding of that party or parties' reliance.") Moreover in *Westpac* the court made unequivocally clear that *Credit Alliance* represents a resolution that the competing policy considerations embodied in *Ultramares* remains sound and that under the current law of the State of New York accountants *"should not have a duty to the public at large." Westpac,* 66 N.Y.2d at 19, 494 N.Y.S.2d at 850, 484 N.E.2d at 1353. (Emphasis added). The cases make clear that accountants are not liable to the public at large or unforeseeable third-parties who have relied on the conduct of the accountants. Where, however, the complaint demonstrates a relationship between the parties who are identified and the parties who have relied on the audit report, the accountants can be held liable.

■ Michigan has "categorically eliminated" the doctrine of privity in favor of an examination of the relationship between the parties. *Williams v. Polgar,* 391 Mich. 6, 215 N.W.2d 149, 153 (1974). *Accord: Reid v. Volkswagen of America, Inc.,* 512 F.2d 1294, 1298 (6th Cir.1975) ("Michigan's rejection of the privity requirement in product liability cases is, as we see it, both sweeping and complete ... It seems clear to us that Michigan's rejection of privity is not limited to tort actions as opposed to warranty, whether express or implied."); *John E. Green Plumbing & Heating v. Turner Construction,* 742 F.2d 965, 966 (6th Cir.1984) *cert. denied,* — U.S. —, 105 S.Ct. 2328, 85 L.Ed.2d 845 (1985) (A contractual relationship is unnecessary to create a duty to a third-party beneficiary); *In re Consumers Power Company Securities Litigation,* 105 F.R.D. 583 (D.C.E.D. Mich.1985); *Cramer v. Metropolitan Savings Assoc.,* 136 Mich.App. 387, 357 N.W.2d 51, 55 (1983) (The lack of privity of contract is an erroneous basis on which to ground an order for summary judgment). In trumpeting the demise of the doctrine of privity, the Court in *Williams* found the strongest argument for maintaining the

privity requirement is to prevent exposure to "virtually unlimited liability." When there is a limit to the amount of damages a defendant may be liable for and the "class to whom the duty is owed is clearly defined", the utility of the doctrine is at best questionable.[8] *Williams v. Polgar*, 43 Mich.App. 95, 100–101, 204 N.W.2d 57 (1972) *aff'd*, 391 Mich. 6, 215 N.W.2d 149 (1974). It is, therefore, the nature of the relationship between the parties which gives rise to the existence of a duty. *Duvall v. Goldin*, 139 Mich.App. 342, 362 N.W.2d 275, 277 (1984); *Green Plumbing, supra.* Though it is also in part a question of foreseeability, *Karrar v. Board of Road Commissioners of Barry*, 127 Mich.App. 821, 339 N.W.2d 653 (1983), the existence of a duty represents an expression of the sum total policy considerations "which leads the law to say that a particular plaintiff is entitled to protection." *Duvall*, 362 N.W.2d at 278, citing *Prosser Torts* (4th Edition), § 53, pp. 325–326. Accordingly, in Michigan nonprivity third-parties may have a cause of action against a defendant based upon the defendant's relationship with another party. *Duvall, supra; Williams, supra; In re Consumers Power, supra; Green Plumbing, supra; Moning v. Alfono*, 400 Mich. 425, 254 N.W.2d 759 (1977).

Though the doctrine of privity has been categorically eliminated in Michigan, the policy considerations outlined in *Ultramares* and *Credit Alliance* remain in full force. In *Consumers Power*, the court followed the rule in *Williams* and dismissed a cause of action for negligent mis-

representation due to the vast amount of liability of the defendant to "any member of the public." The court relied on the policies delineated in *Ultramares* that "mere negligence should not render someone liable to a limitless list of potential plaintiffs." *Consumers Power*, 105 F.R.D. at 597.

The Court of Appeals in *Williams* explicitly found that privity was unnecessary as defendant would be liable only a limited amount and only to a small and defined class of potential plaintiffs. In contrast, recognizing a cause of action for negligent misrepresentation here would expose defendants to a virtually unlimited amount of liability to any member of the public who happened to buy Consumer's stock during a given period.... *[T]he Ultramares approach permits liability for negligent misrepresentation when there is a link between plaintiff and defendant to limit the potential liability and to make its imposition more just.* These links include privity, a bond so close as to approach privity, or a fiduciary duty.

*In re Consumers Power*, 105 F.R.D. at 597. (Emphasis added)

 Though we decline to apply the rule in *Ultramares* and disagree with Andersen's interpretation of *Credit Alliance*, placing *Williams* alongside *Credit Alliance*'s "flexible criteria" finds the policy considerations which they embody compatible. Each precludes liability to members of unforeseeable class of plaintiffs and each imposes liability based on the relationship of the parties. Applying *Credit Alli-*

---

8. Arguments attempting to limit *Williams* to the context of title abstracts have been rejected. *Consumers Power Company*, 105 F.R.D. at 596. The reasoning used by the Michigan Court of Appeals is in line with those cases cited *supra* extending, relaxing or abandoning the doctrine of privity:

> The strongest argument for a privity requirement is that if there were no such requirement the abstractor would be open to virtually unlimited liability. Whatever the situation is with regard to other professional certificates, we do not believe that this is true of abstracts. Abstracts are prepared for a limited class, among them purchasers and mortgagees. The abstractor knows this and cer-

tainly is aware that future purchasers and mortgagees will rely on his abstract. *Thus the class to whom the duty is owed is clearly defined.* Moreover, there is a limit on the amount for which the abstractor may be liable. For example, in a case where the abstractor has failed to note a deed conveying the property and fee simple absolute and the subsequent purchase or loss of the property. That limit is the total value of the property. Contrast this to a case involving an accountant certificate. Here, an unlimited number of people may rely on the certificate in extending credit and the liability is truly unlimited. *Williams*, 43 Mich.App. at 100–101, 204 N.W.2d 57.

*ance* to *Williams* finds privity in its purest form no longer shields accountants or other professionals from liability to foreseeable third-parties; *Williams* clearly limits the effect of the doctrine of privity in finding the existence of a duty. *Consumers Power,* 105 F.R.D. at 596. Further, we find an examination of the relationships of the parties envisions and contemplates reliance by foreseeable third-parties as an appropriate factor to consider in deciding if an accountant or other professional owes a duty of care to another. While a bond so close as to approach privity may be an indicator of the nature of the relationship, it does not control the court's determination as to the existence of a duty. *In re Consumers Power, supra.*

The amount of influence the three part test of *Credit Alliance* has, if any, in making a determination as to the existence of a duty between accountants or other professionals to third-parties is not before the court at this time and, indeed, remains to be determined. For purposes of the motion presently before the court, we note that the third-party complaints filed by Bushkin and Smith allege pursuant to Mich.Comp.Laws Ann. § 450.1541 that as directors of DMC they relied on the certified audit reports prepared by Andersen. Members of the Board of Directors are vested with the ordinary management of the corporation and are held· to a strict accounting for the acts in its management. *Ashman v. Miller,* 101 F.2d 85 (6th Cir. 1939). The Michigan Business Corporation Act requires a director to discharge his duties in good faith and with the degree of diligence, care and skill, which an ordinary prudent person would exercise under similar circumstances in a like position. Mich. Comp.Laws Ann. § 450.1541. In performing their duties directors may rely on the opinions of counsel for the corporation or financial statements stated in a written report by an independent public or certified public accountant or firm of such accountants fairly to reflect the financial condition of the the corporation. Michigan Law and Practice §§ 271, 283, 284, 301 (1985); Michigan Business Corporation §§ 5.06, 5.08 (1984).

Bushkin also alleges, based on Mich. Comp.Laws Ann. § 451.1527, that as a member of the DMC audit committee, he relied on the audit reports. Audit committees are often established by the Board of Directors and consist of members of the Board. The committee generally meets with the independent auditors and receives and evaluates the initial audit report. While debate exists regarding the duties audit committees should perform, *The Overview Committee of the Board of Directors, a Report of ·the Committee on Corporate Laws,* 34 Business Lawyer 1837, 1853 (July 1979), an audit committee, at a minimum is charged with the following functions:

1. To recommend the firm to be employed by the corporation as its independent auditors;
2. To consult with the persons so chosen to be the independent auditors with regard to the plan of audit;
3. To review, in consultation with the independent auditors, their report of audit or proposed report of audit, and the accompanying management letter, if any;
4. To consult with the independent auditors (periodically, as appropriate, out of the presence of management) with regard to the adequacy of the internal controls.

*Id* at 1856.

In the modern business world, the necessity by major corporations to retain independent accountants is ever present and the expectations in reliance on certified audits, by the directors of corporations in making its decisions and the investing public has increased measurably.[9] The reten-

---

**9.** In a Wall Street Journal Article of Tuesday, December 3, 1985, "Close Accounting Confidence Gap", Joseph E. Connor, chairman and senior partner of Price Waterhouse & Co., wrote that a recent Gallup Poll showed that the public has a low level of confidence in business, despite a healthy economy.

> A Gallup Poll last month showed that the public has a low level of confidence in business, despite a generally healthy economy.
>
> * * * * * *
>
> Even without percentages in a poll, the public perception is that the accounting profes-

tion of independent accountants is not only an exercise of the Board's authority but more significantly an extension of the individual directors acting collectively as a prudent person to retain sound financial or legal advice to exercise its best judgment in making a decision for the corporation. "The plain and obvious rule is that directors implicitly undertake to use as much diligence and care as the proper performance of the duties that the office requires". *Martin v. Hardy*, 251 Mich. 413, 232 N.W. 197, 198 (1930).

■ In determining a motion to dismiss pursuant to Fed.R.Civ.Pro. 12(b)(6) the complaint is to be liberally construed; all factual allegations of the complaint are presumed to be true and all reasonable inferences are made in favor of the non-moving party. *D.P. Enterprises, Inc. v. Bucks County Community College*, 725 F.2d 943 (3rd Cir.1984). *In re McRae Fire Protection*, 49 B.R. 773 (Bkrtcy.E.D.Mich.1985). Viewing the motion to dismiss against Michigan's categorical elimination of the doctrine of privity compels the denial of the motion as to Counts I, II, III, and IV of Smith's third-party complaint. As to Count V, based on common law fraud, Andersen argues Smith has failed to plead with particularity. Fed.R.Civ.Pro. (9)(b). We find however the complaint which incorporates paragraph 79 of the trustee's complaint in this adversary proceeding, satisfies the requirements as to particularity. *General Accident Insurance Company v. Fidelity and Deposit Company*, 598 F.Supp. 1223, 1229 (E.D.Pa.1984).

■ Similarly, we find Andersen's motion to dismiss Bushkin's third-party complaint for lack of privity between the parties must be denied as to Counts I, II, III, and IV. Though we seriously question Bushkin being a direct contracting party, as alleged in Count IV, paragraph 24, based on his membership with the Board, the flaw is not fatal to the balance of the allegations in Count IV. Count V of the complaint alleges breach of fiduciary duty. In Michigan a fiduciary relationship exists "only when there is a repository of faith, confidence, trust and the reliance by one upon the judgment and advice of another." *In re Jenning's Estate*, 335 Mich. 241, 244, 55 N.W.2d 812 (1952), *Accord: Potter v. Chamberlain*, 344 Mich. 399, 406, 73 N.W.2d 844 (1955). When performing audits, accountants are in the position of fiduciaries with their clients. *Shwayder Chemical Metallurgy, Corp. v. Baum*, 45 Mich.App. 220, 225, 206 N.W.2d 484 (1973). The motion to dismiss Count V is denied.

Andersen also raises questions as to this court's jurisdiction to hear claims for legal fees and injuries to Smith's reputaion. We

---

sion has fallen short of its responsibilities as the "public's watchdog." And the public may well be asking, "If we can't have faith in those who are supposed to ensure the integrity of the financial information that drives business, how can we have faith in business?"

The public's expectations, not congressional inquiries, are the real challenge facing the accounting profession. These expectations fall into three categories:

—*Expections that the auditor should uncover and disclose fraudulent fiancial reporting.* Current auditing standards imply that the responsibility to search for fraud resulting in misleading financial statements is a byproduct of the main responsibility to examine and report on the financial statements taken as a whole.

But the Securities and Exchange Commission, the courts, many members of senior management and audit committees, and members of congress believe that prevention of fraudulent financial reporting is one of the auditor's *primary* responsibilities.

—*Expectations that the auditor will warn the public of impending business failure.* Demands for an "early-warning system" have seldom been so forceful. The public does not understand how firms can fail almost immediately after receiving clean audit opinions. Invariably, business failures in such circumstances are characterized as audit failures.

—*Expectations that the profession's peer-review process will prevent substandard audit performance and mete out swift punishment if it occurs.* Under the process created in 1978, accounting firms voluntarily undergo a periodic quality-control review by another firm. Critics view this process as too secretive and self-contained, and too reluctant to exact penalties—"hand out scalps." Admittedly, with some logic, they do not understand how firms now accused of failed audit performance could have received clean bills of health from peer reviews.

find all issues regarding the court's jurisdiction were disposed of in *In re DeLorean, supra.* Whatever new arguments Andersen raises here are adequately resolved by *Warren v. McLouth Steel Corporation,* 111 Mich.App. 496, 507–509, 314 N.W.2d 666 (1981).

Accordingly, the motions to dismiss the third-party complaints filed by Smith and Bushkin as to all Counts are, DENIED.

IT IS SO ORDERED.